**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALVOGEN, INC., ALVOGEN PB RESEARCH AND DEVELOPMENT LLC and ALVOGEN MALTA OPERATIONS LTD., <br><br>                      *Plaintiffs*, <br><br>        v. <br><br> NORRIS W. COCHRAN IV, in his official capacity as Acting Secretary of Health and Human Services, <br><br> JANET WOODCOCK, M.D., in her official capacity as Acting Commissioner of Food and Drugs, <br><br>          and <br><br> UNITED STATES FOOD AND DRUG ADMINISTRATION, <br><br>                     *Defendants*. | Civil Action No. 21-672 |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................. 1

GENERIC DRUG ENTRY: THE STATUTORY FRAMEWORK ................................. 3

I.      New and Abbreviated Drug Application Requirements ..................................... 4

II.     First Applicant Status and 180-Day Exclusivity ............................................... 5

III.    Forfeiture of 180-Day Exclusivity .................................................................... 5

STATEMENT OF FACTS ............................................................................................. 8

I.      Teva's First-Filed ANDA .................................................................................. 8

II.     Alvogen's ANDA and FDA's Refusal to Grant It Final Approval .................. 10

ARGUMENT ................................................................................................................ 11

I.      Alvogen is Likely to Succeed on the Merits of Its Claims Against FDA. ....... 12

        A.      Teva Failed to Obtain Tentative Approval of Its ANDAs Within 30
                Months, and Teva's Failure Was Not Caused by a Change in or Review of
                the Approval Requirements. ................................................................. 12

        B.      Teva Lost Any 180-Day Marketing Exclusivity Tied to Its Paragraph IV
                Certifications. ....................................................................................... 21

                1.      Teva Forfeited Any 180-Day Marketing Exclusivity Based on Its
                        Paragraph IV Certification Against the '019  Patent. ............... 21

                2.      Teva Failed to Lawfully Maintain Its Paragraph IV Certification
                        Against the '866 Patent and Should Have Withdrawn or Amended
                        It. ....................................................................................... 22

II.     Alvogen Will Suffer Irreparable Harm Absent Immediate Relief from This Court. ........ 27

        A.      Alvogen Will Be Irreparably Harmed by the Loss of Its First-Mover
                Advantage. ........................................................................................... 27

        B.      Alvogen Will Suffer Substantial and Unrecoverable Economic Loss. ........ 31

III.    Granting the Preliminary Injunction Will Not Substantially Injure Any Other Party. ..... 33

IV.     Preliminary Relief Will Further the Public Interest. ......................................... 34

CONCLUSION .............................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008)..................................................................................29

*Albany Molecular Rsch., Inc. v. Dr. Reddy's Labs., Ltd.*,
    No. 09-4638, 2010 WL 2516465 (D.N.J. June 14, 2010).......................................29

*Amarin Pharm. Ir. Ltd. v. FDA*,
    106 F. Supp. 3d 196 (D.D.C. 2015) ...........................................................................19

*Amneal Pharm. LLC v. FDA*,
    285 F. Supp. 3d 328 (D.D.C. 2018) ...........................................................................18

*Apotex, Inc. v. Daiichi Sankyo, Inc.*,
    781 F.3d 1356 (Fed. Cir. 2015)............................................................................23, 26

*In re Barr Labs., Inc.*,
    930 F.2d 72 (D.C. Cir. 1991) .....................................................................................35

*\*Bracco Diagnostics, Inc. v. Shalala*,
    963 F. Supp. 20 (D.D.C. 1997).............................................................28, 32, 34, 35

*Capitol Hill Baptist Church v. Bowser*,
    No. 20-2710, 2020 WL 5995126 (D.D.C. Oct. 9, 2020) ........................................12

*\*Chevron U.S.A. Inc. v. Nat. Res. Def. Council*,
    467 U.S. 837 (1984).......................................................................................... *passim*

*Eagle Pharm., Inc. v. Azar*,
    952 F.3d 323 (D.C. Cir. 2020) ...............................................................................3, 19

*Feinerman v. Bernardi*,
    558 F. Supp. 2d 36 (D.D.C. 2008) .............................................................................33

*HealthAlliance Hosps., Inc. v. Azar*,
    346 F. Supp. 3d 43 (D.D.C. 2018) ...............................................................................3

*\*Hi-Tech Pharmacal Co. v. U.S. Food & Drug Admin.*,
    587 F. Supp. 2d 1 (D.D.C. 2008)................................................................7, 18, 20, 35

*In re MDL 2700 Genentech Herceptin (Trastuzumab) Mktg. & Sales Prac. Litig.*,
    960 F.3d 1210 (10th Cir. 2020) ..................................................................................24

*Mova Pharm. Corp. v. Shalala*,
    140 F.3d 1060 (D.C. Cir. 1998)........................................................................28

*Mova Pharm. Corp. v. Shalala*,
    955 F. Supp. 128 (D.D.C. 1997)................................................................28, 32

*Mylan Pharm., Inc. v. Thompson*,
    268 F.3d 1323 (Fed. Cir. 2001)......................................................................32

*N.S. v. Hughes*,
    335 F.R.D. 337 (D.D.C. 2020).........................................................................34

*Pearson v. Shalala*,
    130 F. Supp. 2d 105 (D.D.C. 2001)................................................................12

*Pharmacia & Upjohn Co. v. Ranbaxy Pharm., Inc.*,
    274 F. Supp. 2d 597 (D.N.J. 2003) ...........................................................28, 35

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Human Servs.*,
    313 F. Supp. 3d 62 (D.D.C. 2018) ............................................................24, 25

*Ranbaxy Labs., Ltd v. Burwell*,
    82 F. Supp. 3d 159 (D.D.C. 2015) ........................................................7, 20, 35

*STI Pharma, LLC v. Azar*,
    No. 18-1231, 2020 WL 1332004 (D.D.C. Mar. 23, 2020) ....................................19

*Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*,
    482 F.3d 1330 (Fed. Cir. 2007).........................................................................3

*Teva Pharm., USA, Inc. v. U.S. Food & Drug Admin.*,
    182 F.3d 1003, 1011 (D.C. Cir. 1999) ..........................................................17, 28

*TorPharm, Inc. v. Shalala*,
    No. 97-1925, 1997 WL 33472411 (D.D.C. Sep. 15, 1997)........................28, 29, 35

*Whitaker v. Thompson*,
    248 F. Supp. 2d 1 (D.D.C. 2002) ................................................................34, 36

## Statutes

21 U.S.C. § 355.............................................................................................3

21 U.S.C. § 355(a)..........................................................................................4

21 U.S.C. § 355(b)..........................................................................................4

21 U.S.C. § 355(b)(1) .....................................................................................4

21 U.S.C. § 355(j) ...................................................................................................................... 4

21 U.S.C. § 355(j)(2)(A)(vii) .................................................................................................... 5

21 U.S.C. § 355(j)(2)(A)(vii)(III) ............................................................................................ 23

21 U.S.C. § 355(j)(2)(A)(vii)(IV) .............................................................................................. 1

21 U.S.C. § 355(j)(2)(B)(iii) ...................................................................................................... 5

21 U.S.C. § 355(j)(5)(i)(IV) ...................................................................................................... 20

21 U.S.C. § 355(j)(5)(B)(iii) ...................................................................................................... 5

21 U.S.C. § 355(j)(5)(B)(iv) .................................................................................................. 5, 6

21 U.S.C. § 355(j)(5)(B)(iv)(II)(aa) .......................................................................................... 1

*21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb) ........................................................................ 1, 8, 24, 26

21 U.S.C. § 355(j)(5)(D)(i) ........................................................................................................ 1

21 U.S.C. § 355(j)(5)(D)(i)(I)–(VI) ........................................................................................... 6

*21 U.S.C. § 355(j)(5)(D)(i)(III) ....................................................................................... passim

*21 U.S.C. § 355(j)(5)(D)(i)(IV) ....................................................................................... passim

21 U.S.C. § 355(j)(5)(D)(i)(VI) ............................................................................................... 22

21 U.S.C. § 355(q)(1)(G) .......................................................................................................... 13

21 U.S.C. § 393 ......................................................................................................................... 33

21 U.S.C. § 812(b)(2) ........................................................................................................... 8, 35

21 U.S.C. § 812(b)(3) ........................................................................................................... 8, 35

35 U.S.C. § 156 .......................................................................................................................... 3

35 U.S.C. § 271(e) ..................................................................................................................... 3

35 U.S.C. § 282 .......................................................................................................................... 3

PL 108–173, December 8, 2003, 117 Stat 2066 ........................................................................ 6

**Other Authorities**

21 C.F.R. § 314.53 ..................................................................................................................... 4

21 C.F.R. § 314.94(a)(12)(i)(A)(4) .............................................................................5

21 C.F.R. § 314.94(a)(12)(i)(A)(4)(i) .........................................................................5

*21 C.F.R. § 314.94(a)(12)(viii)(A) .........................................................23, 24, 25, 26

21 C.F.R. § 314.94(a)(12)(viii)(C)(1)(i) ...................................................................10

149 Cong. Rec. S15884 (daily ed. Nov. 25, 2003) (statement of Sen. Kennedy) ..........................7

65 Fed. Reg. 67,012, 67,013 ....................................................................................33

*Examining the Senate and House Versions of the "Greater Access to Affordable
    Pharmaceuticals Act": Hearing before the S. Comm. on the Judiciary*, 108th
    Cong. 390 (2003) (prepared statement of Timothy J. Muris, Chairman, Federal
    Trade Comm'n)..........................................................................................................6

*Legislative and Regulatory Responses to the FTC Study on Barriers to Entry in
    the Pharmaceutical Marketplace: Hearing Before the S. Comm. on the
    Judiciary*, 108th Cong. 250 (2003) .......................................................................6

## INTRODUCTION

On May 23, 2018, the Food and Drug Administration ("FDA") received Abbreviated New Drug Application ("ANDA") No. 211594 ("Alvogen's ANDA") from Alvogen PB Research and Development LLC, acting as the U.S. agent for Alvogen Malta Operations Ltd.,[1] seeking approval to market generic buprenorphine buccal film in dosage strengths 75 mcg, 150 mcg, 300 mcg, 450 mcg, 600 mcg, 750 mcg, and 900 mcg ("Alvogen's ANDA Product"). *See* Declaration of Paul Fackler ("Fackler Decl.") ¶ 15.  Just slightly more than one year after submission, on June 12, 2019, FDA granted tentative approval to Alvogen's ANDA, finding that Alvogen's product met all of the requirements for obtaining final approval but delaying final approval because of a 30-month stay in place at that time.  *Id.* ¶ 17.

In anticipation of the 30-month stay's expiration, Alvogen requested final approval on January 30, 2021.  *Id.* ¶ 18-19.  Alvogen expected final approval because publicly available information indicated that the "first" applicant,[2] Teva Pharmaceuticals USA, Inc. ("Teva"), had forfeited any entitlement to the 180-day exclusivity period.  *Id.* ¶ 19.  Yet, in response, FDA sent another tentative approval letter, citing "exclusivity issue[s]" as a reason for maintaining tentative approval.  *Id.* ¶ 20 (citing Fackler Decl. Exhibit 4 at 2).

---

[1] Alvogen, Inc. is the marketing agent for Alvogen's ANDA Product.  Alvogen, Inc., Alvogen PB Research and Development LLC, and Alvogen Malta Operations Ltd. are hereinafter collectively referred to as "Alvogen."

[2] A "first applicant" is an ANDA applicant that was the first to submit a substantially complete ANDA containing a certification under 21 U.S.C. § 355(j)(2)(A)(vii)(IV) ("Paragraph IV Certification") for a patent listed in FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly known as the "Orange Book") for the Reference Listed Drug ("RLD") in the subject ANDA.  *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb).  If the "first applicant" lawfully maintains its Paragraph IV Certification, it is entitled to 180-day marketing exclusivity, unless that 180-day exclusivity is forfeited.  *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(aa), (bb); 21 U.S.C. § 355(j)(5)(D)(i).

The most recent tentative approval letter states that Alvogen's "ANDA will be eligible for final approval on the date that is 180 days after the commercial marketing date identified in section 505(j)(5)(B)(iv) of the [Federal Food, Drug and Cosmetic] Act." *Id.* ¶ 20 (citing Fackler Decl. Exhibit 4 at 2). In other words, FDA has decided that Alvogen's ANDA is not eligible to receive final approval until the date that is 180 days after Teva begins commercial marketing of its ANDA product. But, Teva forfeited the 180-day exclusivity period for at least two reasons. First, Teva failed to obtain approval (tentative or final) within 30 months of filing its ANDAs, and "the failure [was not] caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application [wa]s filed." *See* 21 U.S.C. § 355(j)(5)(D)(i)(IV). Second, Teva did not maintain its Paragraph IV certification when it stipulated to an order signed and entered by the U.S. District Court for the District of Delaware that the patents are valid, enforceable, and infringed. Indeed, it does not stand to reason that an applicant can maintain a certification that the patents are invalid, not infringed, or unenforceable before the FDA (i.e., a Paragraph IV certification) when a court has entered a final, nonappealable order stating the opposite.

Despite these clear forfeiture events, FDA has rendered a final decision refusing to approve Alvogen's ANDA. *Id.* ¶ 20. FDA's decision will enable Teva to continue to inappropriately park its exclusivity until 2027 – or later – given its patent settlement, contravening the plain statutory directives and congressional intent in adopting the forfeiture provisions in the Medicare Modernization Act of 2003 ("MMA") and depriving patients of access to a less expensive generic alternative to this important medication. FDA's decision should thus be reversed by this Court as contrary to a plain reading of the statute and regulations under step one of the *Chevron* analysis. *Chevron U.S.A. Inc. v. Nat. Res. Def. Council*, 467 U.S.

837, 842 (1984) (finding that courts should first look to the statue's language to determine if Congress has "directly spoken to the precise question at issue"); *Eagle Pharm., Inc. v. Azar*, 952 F.3d 323, 330-40 (D.C. Cir. 2020) (finding that Congress clearly expressed its intent in the statute at issue and reversing FDA's interpretation under *Chevron* step one); *HealthAlliance Hosps., Inc. v. Azar*, 346 F. Supp. 3d 43, 56 (D.D.C. 2018) (setting aside agency action because "HHS acted in a manner that was contrary to its own regulations").

FDA's decision is causing Alvogen to suffer irreparable harm and adversely impacting the public interest by preventing access to less expensive alternatives on the market. In this time of great uncertainty when our healthcare system is being pushed to its limits, it is more important than ever that generic products are allowed to hit the market as quickly as possible. This Court should, therefore, grant Alvogen's motion for a preliminary injunction and order Defendants to immediately grant final approval to Alvogen's ANDA.

## GENERIC DRUG ENTRY: THE STATUTORY FRAMEWORK

The Federal Food Drug & Cosmetic Act ("FDCA") establishes the requirements for marketing drugs in the United States. In 1984, Congress amended the FDCA to provide a streamlined process that manufacturers could use to obtain approval for a generic drug – a drug which contains the same active ingredient as, and is bioequivalent to, a brand name drug. Generic drugs are generally sold without a trademark and at significantly lower prices than branded drugs. The FDCA amendments, which are codified at 21 U.S.C. § 355 and 35 U.S.C. §§ 156, 271(e) and 282, are commonly referred to as the "Hatch-Waxman Amendments" or the "Hatch-Waxman Act." "A central purpose of the Hatch-Waxman Act . . . is 'to enable competitors to bring cheaper, generic . . . drugs to market as quickly as possible.'" *Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1334 (Fed. Cir. 2007) (citing 149 Cong. Rec. S15885 (Nov. 25, 2003)).

I. **NEW AND ABBREVIATED DRUG APPLICATION REQUIREMENTS**

Before marketing a new drug in the United States, the FDCA requires a drug company to submit a New Drug Application ("NDA") to FDA, and FDA must approve it. *See* 21 U.S.C. § 355(a), (b). New drugs generally are referred to as "brand name" drugs because they are marketed under a trademark for the drug product rather than the chemical name for the active ingredient in the drug product.

The NDA applicant must identify each patent that claims the drug or a method of using the drug that is the subject of the NDA and that could reasonably be asserted in a patent infringement action against a person engaged in the unauthorized manufacture, use, or sale of the drug product. *See* 21 U.S.C. § 355(b)(1); 21 C.F.R. § 314.53. Once FDA approves an NDA, FDA publishes the patent information submitted by the brand name drug company in the Orange Book. *See* 21 U.S.C. § 355(b)(1).

Drug companies cannot market generic drugs in the United States until they submit an ANDA to FDA that FDA approves. *See* 21 U.S.C. § 355(a), (j). The ANDA approval process allows an applicant to rely on the data in an NDA for a brand name drug to show safety and effectiveness, so long as the ANDA drug product is bioequivalent to the branded drug in question, referred to as the Reference Listed Drug ("RLD").

A generic drug company seeking FDA approval for a generic version of a brand name drug product must file, in addition to technical data, one of four certifications with FDA: either (I) that no patent information for the RLD has been filed with FDA; or, for each patent listed in the Orange Book as claiming the RLD or a method of use for which the ANDA applicant is seeking approval, (II) that the patent has expired; (III) that the patent will expire on a particular date (until which time the generic company is not seeking to market its generic product); or (IV) that the patent is invalid, unenforceable, or will not be infringed by the manufacture, use, or

4

sale of the generic drug for which the ANDA is submitted.  *See* 21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. § 314.94(a)(12)(i)(A)(4)(i).  This last certification is commonly referred to as a "Paragraph IV certification."  *See* 21 C.F.R. § 314.94(a)(12)(i)(A)(4).

If an ANDA applicant makes a Paragraph IV certification, it must provide notice of such certification to the patent owner and the NDA holder.  *See* 21 U.S.C. § 355(j)(2)(B)(iii).  This notice is commonly known as a "Notice Letter."  If suit is brought against the ANDA applicant within 45 days after receipt of the Notice Letter, then final approval of the ANDA is stayed for 30 months from the date of receipt of the Notice Letter.  *See* 21 U.S.C. § 355(j)(5)(B)(iii).

## II.     FIRST APPLICANT STATUS AND 180-DAY EXCLUSIVITY

In order to encourage generic companies to take on the risks and costs of challenging Orange Book patents and thereby bring to consumers the benefit of lower-priced generic drugs as quickly as possible, Congress provided that the first ANDA applicant to file an ANDA with a Paragraph IV certification (the "First Applicant") is given a 180-day period during which it is the only ANDA applicant allowed to market a generic version of the brand name drug.  *See* 21 U.S.C. § 355(j)(5)(B)(iv).  Specifically, Section 355(j)(5)(B)(iv) provides that, if an ANDA with a Paragraph IV certification

> is for a drug for which a first applicant has submitted an application containing [a Paragraph IV] certification, the application [of the later applicant] shall be made effective on the date that is 180 days after the date of the first commercial marketing of the drug . . . by any first applicant.

*Id.*

## III.    FORFEITURE OF 180-DAY EXCLUSIVITY

Under the provisions of the FDCA in effect before 2003, the 180-day period of marketing exclusivity did not begin to run until the earlier of (1) the first commercial marketing of the ANDA product or (2) a court decision finding the relevant patents invalid or not infringed.  *See*

21 U.S.C. § 355(j)(5)(B)(iv) (2003).  Under that statutory structure, the Federal Trade

Commission ("FTC") found that First Applicants would sometimes enter into settlement

agreements by which they agreed to not begin commercial marketing for long periods of time.

*See Legislative and Regulatory Responses to the FTC Study on Barriers to Entry in the*

*Pharmaceutical Marketplace: Hearing Before the S. Comm. on the Judiciary*, 108th Cong. 250

(2003) (Submission for the Record, prepared statement of Federal Trade Comm'n), at 34.[3]  The

FTC began to investigate and challenge certain agreements, finding that they were sometimes

being used to "impede entry by other generic competitors."  *Id.*  Partly in response to the FTC's

conclusions that certain settlement agreements were acting as a "bottleneck" and were unduly

delaying generic competition and negatively impacting the public's interest in obtaining low cost

drugs, Congress amended the FDCA in 2003 by enacting the MMA.  *See* PL 108–173, December

8, 2003, 117 Stat 2066.

      The MMA sets forth provisions by which a First Applicant could forfeit its exclusivity.

*See* 21 U.S.C. § 355(j)(5)(D)(i)(I)–(VI).  These forfeiture provisions "attempt[] to safeguard

against the possibility that first generic applicants will delay the start of commercial marketing"

and "intend[] to prevent parking of the exclusivity . . . by providing for several situations in

which a generic company with the exclusivity forfeits the exclusivity, clearing the way for other

generic companies to bring their products to market."  *See Examining the Senate and House*

*Versions of the "Greater Access to Affordable Pharmaceuticals Act": Hearing before the S.*

*Comm. on the Judiciary*, 108th Cong. 390 (2003) (prepared statement of Timothy J. Muris,

---

[3] *Available at* https://www.govinfo.gov/content/pkg/CHRG-108shrg91212/pdf/CHRG-
108shrg91212.pdf (last visited Mar. 10, 2021).

Chairman, Federal Trade Comm'n);[4] 149 Cong. Rec. S15884 (daily ed. Nov. 25, 2003) (statement of Sen. Kennedy).  "The forfeiture triggers were written into the statute to prevent first applicants from 'parking' their rights by failing to act on their applications, either due to a monetary 'pay-to-delay' settlement or for other reasons."  *Ranbaxy Labs., Ltd v. Burwell*, 82 F. Supp. 3d 159, 197 (D.D.C. 2015); *see also* GENERIC DRUG ENTRY PRIOR TO PATENT EXPIRATION: AN FTC STUDY, 2002 WL 1775284, at \*48 (July 1, 2002) (stating that data showed that before the MMA, 14 out of 20 settlement agreements between generic drug manufactures and NDA holders "had the potential, at the time they were executed, to 'park' the first generic applicant's 180-day exclusivity for some period of time, thus preventing FDA approval of any eligible subsequent applicants").  As noted by this Court, "Congress enacted the forfeiture provisions to 'ensure that the 180–day exclusivity period enjoyed by the first generic to challenge a patent cannot be used as a bottleneck to prevent additional generic competition.'"  *Hi-Tech Pharmacal Co. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 1, 4 (D.D.C. 2008) (citing 149 Cong. Rec. S15746 (daily ed. Nov. 24, 2003) (statement of Sen. Schumer)).

Under one of the MMA's forfeiture provisions, forfeiture can occur if the "[t]he first applicant fails to obtain tentative approval of [its ANDA] within 30 months after the date on which the application is filed."  *See* 21 U.S.C. § 355(j)(5)(D)(i)(IV).  The only exception to this provision is if "the failure [to obtain tentative approval] is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed."  *Id.*  Forfeiture can also occur if the First Applicant withdraws its Paragraph IV certification or amends it to one of the other types of certifications.  *See* 21 U.S.C.

---

[4] *Available at* https://www.judiciary.senate.gov/imo/media/doc/muris_testimony_08_01_03.pdf (last visited Mar. 10, 2021).

§ 355(j)(5)(D)(i)(III).  Separate from the forfeiture provisions related to withdrawal or amendment of a Paragraph IV certification, a First Applicant must also lawfully maintain its Paragraph IV certification to remain entitled to 180-day marketing exclusivity.  *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb).

## STATEMENT OF FACTS

### I.   TEVA'S FIRST-FILED ANDA

BioDelivery Sciences International, Inc. ("BDSI") is the holder of NDA No. 207932, under which it markets buprenorphine hydrochloride buccal film ("Buprenorphine Film") in various dosage strengths under the brand name BELBUCA.  *See* Declaration of Tunie Zaku ("Zaku Decl.") ¶ 6.  Buprenorphine Film is prescribed for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.  *Id.* ¶ 6.  In 2020, physicians wrote over 431,000 total prescriptions for BELBUCA that resulted in $136,128,000 in net sales for BDSI.  *Id.* ¶ 6; *see also* Exhibit A at 7, F-26.  Buprenorphine is a Schedule III opioid,[5] having less abuse and addiction potential compared to Schedule II opioids, such as oxycodone, fentanyl, hydrocodone, and morphine.  *See* 21 U.S.C. § 812(b)(3) (stating that a Schedule III drug "has a potential for abuse less than the drugs or other substances in schedules I and II" and "[a]buse of the drug or other substance may lead to moderate or low physical dependence or high psychological dependence"); 21 U.S.C. § 812(b)(2) (stating that a Schedule II drug "has a high potential for abuse" and "[a]buse of the drug or other substances may lead to severe psychological or physical dependence").

---

[5] *See* DEA Controlled Substances listing, *available at* https://www.deadiversion.usdoj.gov/ schedules/orangebook/c_cs_alpha.pdf, at 6 (last visited Mar. 10, 2021).

On information and belief, Teva is the First Applicant for ANDAs referencing BELBUCA, being the first to purportedly submit substantially complete ANDAs with Paragraph IV Certifications for two of the patents listed in the Orange Book for BELBUCA at the time of Teva's ANDA submissions (U.S. Patent Nos. 7,579,019 ("the '019 patent") and 8,147,866 ("the '866 patent)).  *See* FDA Paragraph IV Certification List at 9;[6] Answer, *BioDelivery Scis. Int'l, Inc. v. Teva Pharm. USA, Inc.*, No. 16-1303 (D. Del. Jan. 19, 2017), ECF No. 7 ¶¶ 22-25, 38-41; Answer, *BioDelivery Scis. Int'l, Inc. v. Teva Pharm. USA, Inc.*, No. 17-118 (D. Del. Mar. 17, 2017), ECF No. 8 ¶¶ 21-22, 35-36.  Teva's ANDAs were submitted as follows:

1.  ANDA No. 209704, submitted on September 12, 2016, for Buprenorphine Film, 900 mcg;

2.  ANDA No. 209772, submitted on October 4, 2016, for Buprenorphine Film, 300 mcg, 450 mcg, 600 mcg, and 750 mcg; and

3.  ANDA No. 209807, submitted on  October 24, 2016, for Buprenorphine Film, 75 mcg and 150 mcg.

The expiration of the 30-month period from those submission dates occurred on March 12, 2019, April 4, 2019, and April 24, 2019, respectively.

BDSI brought suit against Teva, asserting infringement of the '019 and '866 patents based on Teva's ANDA submissions.  Complaint, *BDSI/Teva*, No. 16-1303 (D. Del. Dec. 22, 2016), ECF. No. 1; Complaint, *BDSI/Teva*, No. 17-118 (D. Del. Feb. 3, 2017), ECF No. 1 (collectively, "the *BDSI/Teva* cases").  On February 7, 2018, the court overseeing the litigation between Teva and BDSI entered a Stipulation and Order of Dismissal that stated, among other things, that Teva "acknowledge[s] and agree[s] that the ['019 and '866 patents] are valid, enforceable, and infringed with respect to [Teva's ANDAs]."  *See* Stipulation and Order of

---

[6] *Available at* https://www.fda.gov/media/133240/download (last visited Mar. 10, 2021).

Dismissal, *BDSI/Teva*, No. 16-1303 (D. Del. Feb. 7, 2018), ECF No. 38 (Exhibit B at 2);

Stipulation and Order of Dismissal, *BDSI/Teva*, No. 17-118 (D. Del. Feb. 7, 2018), ECF No. 17

(Exhibit B at 5).  The court further ordered that "[a]ll claims and defenses . . . are hereby

dismissed, with prejudice" and that the "Stipulation [a]nd Order shall finally resolve this Action

between Plaintiffs and Defendants."  *See, e.g.*, Stipulation and Order of Dismissal, *BDSI/Teva*,

No. 16-1303 (D. Del. Feb. 7, 2018), ECF No. 38 (Exhibit B at 2-3).  The court also enjoined

Teva from marketing its ANDA products before expiration of the '866 patent (which will not

occur until July 23, 2027), "except as provided in the parties' settlement agreement."[7]  *See, e.g.*,

*id.* (Exhibit B at 2); Orange Book entry for BELBUCA.[8]  The court also ordered that the parties

"expressly waive[d] any right to appeal or otherwise move for relief from" the court's order.

*See, e.g.*, *id.* (Exhibit B at 2).

## II.      ALVOGEN'S ANDA AND FDA'S REFUSAL TO GRANT IT FINAL APPROVAL

Alvogen submitted its ANDA for Buprenorphine Film, 75 mcg, 150 mcg, 300 mcg,

450 mcg, 600 mcg, and 750 mcg, and 900 mcg on May 23, 2018.  *See* Fackler Decl. ¶ 15.

Alvogen's ANDA contained Paragraph IV certifications against the '866 patent and U.S. Patent

Nos. 9,655,843 ("the '843 patent") and 9,901,539 ("the '539 patent"), both of which had been

listed in the Orange Book for BELBUCA after Teva filed its ANDAs.  *Id.* ¶ 15.  On July 27,

2018, Alvogen provided notice of its Paragraph IV certifications to BDSI, and BDSI brought a

---

[7] The '019 patent expired on January 22, 2020, and can no longer provide the basis for 180-day marketing exclusivity.  *See* 21 U.S.C. § 355(j)(5)(D)(i)(III); 21 C.F.R. § 314.94(a)(12)(viii)(C)(1)(i) ("An applicant must amend a submitted certification or statement if, at any time before the date of approval of the ANDA, the applicant learns that the submitted certification or statement is no longer accurate").

[8] *Available at*  https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No= 003&Appl_No=207932&Appl_type=N (last visited Mar. 10, 2021).

patent infringement suit within 45 days of receipt of Alvogen's notice, resulting in a 30-month stay on final approval of Alvogen's ANDA.  *Id.* ¶ 15.

In a letter dated June 12, 2019, FDA granted tentative approval to Alvogen's ANDA, concluding "that adequate information has been presented to demonstrate that the drug is safe and effective for use as recommended in the submitted labeling."  *Id.* ¶ 17 (citing Fackler Decl. Exhibit 3 at 1, 2).  FDA also stated, however, that final approval could not be granted until one of three events occurred: (a) expiration of the 30-month stay on final approval of Alvogen's ANDA, (b) the date on which a court decides that the '866, '843, and '539 patents are invalid or not infringed, or (c) expiration of the '866, '843, and '539 patents.  *Id.*

The 30-month stay on final approval of Alvogen's ANDA expired on January 30, 2021. *Id.* ¶ 18.  Alvogen, therefore, requested final approval from FDA for January 30, 2021.  *Id.* ¶ 19. Alvogen expected no issues receiving the requested final approval because publicly available information indicated that Teva had forfeited any exclusivity arising from it being the First Applicant.  *Id.* ¶ 19.

Yet, in response to Alvogen's request, FDA sent another tentative approval letter, citing "exclusivity issue[s]" associated with a First Applicant, i.e., Teva, as a reason for maintaining tentative approval and denying grant of final approval to Alvogen's ANDA.  *Id.* ¶ 20 (citing Fackler Decl. Exhibit 4 at 2).  To date, Alvogen has not received final approval, depriving it of access to the market and patients from accessing a less expensive generic product.

## ARGUMENT

Courts must weigh four factors in deciding whether to grant a preliminary injunction: (1) whether there is a substantial likelihood that the movant will succeed on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not granted; (3) whether the injunction will substantially injure other interested parties; and (4) whether the public interest

would be furthered by the injunction.  *Pearson v. Shalala*, 130 F. Supp. 2d 105, 112 (D.D.C. 2001) (citing *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998)).[9]  Here, all four factors weigh *strongly* in favor of granting immediate relief to Alvogen by ordering FDA to grant final approval to Alvogen's ANDA.

## I.   ALVOGEN IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS AGAINST FDA.

Alvogen is likely to succeed on the merits of its claims against Defendants for two independent reasons.  First, Teva has forfeited its entitlement to the 180-day exclusivity period because it failed to obtain tentative approval of its ANDAs within 30 months of submission and such failure was not caused by a change in or a review of the requirements for approval.  Second, in light of the court's entry of an order in the *BDSI/Teva* cases in which the '866 patent was found to be valid, enforceable, and infringed, Teva should no longer be considered the First Applicant given its failure to maintain its challenge to the patents (and thus failure to maintain is Paragraph IV certification), and Teva should be deemed to have forfeited the 180-day exclusivity period because it was required by FDA regulation to amend its Paragraph IV certification.

### A.   Teva Failed to Obtain Tentative Approval of Its ANDAs Within 30 Months, and Teva's Failure Was Not Caused by a Change in or Review of the Approval Requirements.

Although FDA decided that Alvogen is ineligible for final approval because of the 180-day exclusivity period, any such period has long been forfeited.  Specifically, Teva failed to obtain *any* approval (tentative or final) of its ANDAs within 30 months after their filing.  *See*

---

[9] Alvogen is seeking mandatory preliminary injunctive relief because its request for final approval seeks to alter, rather than preserve, the *status quo*.  *Capitol Hill Baptist Church v. Bowser*, No. 20-2710, 2020 WL 5995126, at *3-4 (D.D.C. Oct. 9, 2020).  While the D.C. Circuit has not opined on whether the standard of review for mandatory preliminary injunctive relief requires a heightened showing, Alvogen still prevails even if this Court were to apply such a standard.

Fackler Decl. ¶ 14.  And importantly, as discussed herein, Teva's failure to obtain approval was not "caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application [wa]s filed."  *See* 21 U.S.C. § 355(j)(5)(D)(i)(IV).  FDA's decision to delay the approval of Alvogen's ANDA is contrary to a plain reading of the statute and should thus be reversed by this Court.  *Chevron*, 467 U.S. at 842.

As discussed above, Teva's first ANDA, with a Paragraph IV certification for the 900 mcg dose, was submitted in September 2016; its second and third ANDAs, with Paragraph IV certifications for the 75 mcg, 150 mcg, 300 mcg, 450 mcg, 600 mcg, and 750 mcg doses, were submitted in October 2016.  *See* Section II, *supra*.  Thirty months from these submission dates is March 2019 and April 2019, respectively.  The 30-month deadline for each of these submissions occurred nearly two years ago, yet Teva still does not have approval (final or tentative).  Therefore, under Section 355(j)(5)(D)(i)(IV), Teva's failure to timely obtain tentative approval mandates forfeiture of its 180-day exclusivity under the clear statutory directive.

There is no basis here to extend the 30-month deadline to obtain approval.  The FDCA unambiguously states that to avoid forfeiture resulting from not obtaining timely tentative approval requires that the failure be "caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed."  *See* 21 U.S.C. § 355(j)(5)(D)(i)(IV).[10]  As FDA has recognized, the exclusivity period will be preserved only if the First Applicant failed to obtain tentative approval within 30 months and the "evidence demonstrates that there was a change in, or a review of, the requirements for approval and that the applicant was actively addressing issues related to the change in, or review of, approval

---

[10] FDA can also extend the 30-month period to obtain tentative approval due to the submission of a citizen petition.  *See* 21 U.S.C. § 355(q)(1)(G).  No citizen petitions, however, have been filed for Buprenorphine Film.  *See* Fackler Decl. ¶ 13.

requirements . . . and these efforts precluded tentative approval or final approval at that time."
*Guidance for the Industry, 180-Day Exclusivity: Questions and Answers, Draft Guidance* ("180-Day Exclusivity Q&A Guidance") (Jan. 2017) at 22.[11]   This exception clearly does not apply here.

At the time of filing of each of Teva's three ANDAs, FDA had issued draft guidance for another buprenorphine hydrochloride-containing buccal film product.  Because that guidance was the only guidance in existence for a buprenorphine hydrochloride-containing buccal film product at the time Teva submitted each of its ANDAs, a sophisticated ANDA filer – like Teva – would have likely followed that guidance and conducted the recommended studies.  *See* Fackler Decl. ¶ 9.  As explained in more detail below, that guidance had nearly identical requirements to the draft guidance that eventually issued in February 2018 for Buprenorphine Film.  Moreover, more than 36 months have elapsed since the Buprenorphine Film-specific draft guidance issued, giving Teva ample time to address any issues needed for it to obtain tentative approval.  These two items are addressed in turn below.

First, at the time of filing of each of Teva's ANDAs, FDA had issued a draft guidance for buprenorphine hydrochloride; naloxone hydrochloride buccal film (BUNAVAIL).  *See Draft Guidance on Buprenorphine Hydrochloride; Naloxone Hydrochloride* ("Buprenorphine; Naloxone Film Guidance") (Mar. 2015) (Exhibit C).[12]   As mentioned above, because the Buprenorphine; Naloxone Film Guidance was the only guidance in existence for a buprenorphine hydrochloride-containing buccal film product at the time Teva submitted each of its ANDAs,

---

[11] *Available at* https://www.fda.gov/media/102650/download (last visited Mar. 10, 2021).

[12] *Available at* https://www.accessdata.fda.gov/drugsatfda_docs/psg/Buprenorphine%20HCL_Naloxone%20HCL_Buccal%20Film_205637_RC03-15.pdf (last visited Mar. 10, 2021).

Teva would have likely followed that guidance and conducted the recommended studies as outlined therein. *See* Fackler Decl. ¶ 9. In February 2018, FDA then issued a product-specific guidance for Buprenorphine Film (the "Buprenorphine Film Guidance" (Exhibit D)[13]), but there is nothing in that guidance that is out of the norm or that would have required Teva to conduct additional testing if it had followed the earlier Buprenorphine; Naloxone Film Guidance. In fact, as shown in the table below, both guidances have substantially identical requirements:

| Buprenorphine; Naloxone Film Guidance (2015)[14] | Buprenorphine Film Guidance (2018)[15] |
| --- | --- |
| "Type of study: Fasting" (p. 1) | "Type of Study: Fasting" (p. 1) |
| "Design: Single-dose, two-way crossover in vivo" (p. 1) | "Design: Single-dose, two treatment, two-period crossover in vivo" (p. 1) |
| "Strength: 6.3 mg; 1 mg Buprenorphine (base); Naloxone (base) [i.e., highest strength]" (p. 1) | "Strength: EQ 0.9 mg Base [i.e., highest strength]" (p. 1) |
| "**Analytes to measure (in appropriate biological fluid):** Buprenorphine and its active metabolite, nor-buprenorphine, in plasma. . . ." (p. 2) | "**Analytes to measure (in appropriate biological fluid):** Buprenorphine and its active metabolite, nor-buprenorphine, in plasma." (p. 1) |
| "Submit the metabolite data as supportive evidence of comparable therapeutic outcome. For the metabolite, the following data should be submitted: individual and mean concentrations; individual and mean pharmacokinetic parameters; and geometric means and ratios of means for AUC and Cmax." (p. 2) | "Submit the metabolite data as supportive evidence of comparable therapeutic outcome. For the metabolite, the following data should be submitted: individual and mean concentrations; individual and mean pharmacokinetic parameters; and geometric means and ratios of means for AUC and Cmax." (p. 1) |
| "**Bioequivalence based on (90% CI):** Buprenorphine and Naloxone" (p. 2) | "**Bioequivalence based on (90% CI):** Buprenorphine" (p. 1) |
| "**Waiver request of in vivo testing:** Buprenorphine EQ 0.075 mg Base; EQ 0.15 mg Base; EQ 0.3 mg Base; EQ 0.45 mg Base [i.e., lower strengths]; EQ 0.6 mg Base buccal | "**Waiver request of in vivo testing:** Buprenorphine (base); Naloxone (base) 4.2 mg; 0.7 mg and 2.1 mg; 0.3 mg buccal films [i.e., lower strengths] based on (i) acceptable |

[13] *Draft Guidance on Buprenorphine Hydrochloride* (Feb. 2018), a*vailable at* https://www.accessdata.fda.gov/drugsatfda_docs/psg/Buprenorphine%20 hydrochloride_buccal%20film_NDA%20207932_RC11-17.pdf

[14] All citations to Buprenorphine; Naloxone Film Guidance (Mar. 2015) (Exhibit C).

[15] All citations to Buprenorphine Film Guidance (Feb. 2018) (Exhibit D).

| Buprenorphine; Naloxone Film Guidance (2015)[14] | Buprenorphine Film Guidance (2018)[15] |
|---|---|
| films based on (i) acceptable BE study on the EQ 0.9 mg Base strength [i.e., highest strength], (ii) acceptable in vitro dissolution testing of all strengths, and (iii) proportional similarity of the formulations across all strengths." (p. 2) | BE study on the 6.3 mg; 1 mg strength [i.e., highest strength], (ii) acceptable in vitro dissolution testing of all strengths, and (iii) proportional similarity of the formulations across all strengths." (pp. 1-2) |
| "**Dissolution test method and sampling times:** . . . Conduct comparative dissolution testing on 12 dosage units each of all strengths of the test and reference products. Specifications will be determined upon review of the abbreviated new drug application (ANDA)." (p. 2) | "**Dissolution test method and sampling times:** . . . Conduct comparative dissolution testing on 12 dosage units each of all strengths of the test and reference products. Specifications will be determined upon review of the abbreviated new drug application (ANDA)." (p. 2) |

Due to these striking similarities, by following the Buprenorphine; Naloxone Film Guidance in place at the time it filed its ANDAs, Teva would have fully complied with the requirements of the Buprenorphine Film Guidance when it was eventually issued in February 2018. *See* Fackler Decl. ¶ 11. As shown in the table above, nothing in the later-issued Buprenorphine Film Guidance materially changes any requirement outlined in the Buprenorphine; Naloxone Film Guidance.

And, even if Teva had mistakenly not followed the earlier guidance, Teva would have had ample time to conduct any necessary testing prescribed by the February 2018 Buprenorphine Film Guidance before the 30-month deadline (i.e., March 2019 and April 2019, respectively) as such testing typically takes three to seven months. *Id.* ¶ 12. In fact, Alvogen initiated its bioequivalence study for its ANDA Products *prior to* the issuance of the Buprenorphine Film Guidance in 2018 and consistent with the earlier Buprenorphine; Naloxone Film Guidance. *Id.* ¶ 16. Alvogen completed those studies in seven months, from initiation to final report, and Alvogen received tentative approval within 13 months of submission. *Id.*

Therefore, there have not been *any* changes that could be considered "a change in or a review of the requirements for approval" for Teva's ANDAs.  *See* 21 U.S.C. § 355(j)(5)(D)(i)(IV).  But even if the February 2018 Buprenorphine Film Guidance was considered a change in the approval requirements – which it was not – the Buprenorphine Film Guidance **did not cause** Teva to fail to obtain tentative approval.  *Id.* (stating that forfeiture for failure to obtain tentative approval within 30 months of ANDA submission is excused only if that failure was "**caused by** a change in or a review of the requirements for approval" (emphasis added)).  Teva certainly could have made any adjustments to its bioequivalence study or even conducted an entirely new study after the issuance of the Buprenorphine Film Guidance and before expiration of the 30-month deadline.  Indeed, Teva still had just over a year left until expiration of the original 30-month deadline when the Buprenorphine Film Guidance was issued, and bioequivalence testing typically takes only three to seven months.  *See* Fackler Decl. ¶ 12.  Moreover, even if the 30-month deadline was somehow tolled due to the release of the Buprenorphine Film Guidance, it's been more than 36 months since that Guidance was issued in February 2018.  Given that Alvogen was able to obtain tentative approval for its entire ANDA in less than 13 months (also without having the benefit of the 2018 Buprenorphine Film Guidance), it would be an absurd result for FDA to allow Teva to park its exclusivity until 2027 if Teva was unable to make any adjustments to its bioequivalence study in the last 36 months.  *See Teva Pharm., USA, Inc. v. U.S. Food & Drug Admin.*, 182 F.3d 1003, 1011 (D.C. Cir. 1999) ("FDA must interpret the statute to avoid absurd results and further congressional intent.").  Such a result would certainly be contrary to Congressional intent given that "Congress enacted the forfeiture provisions to 'ensure that the 180–day exclusivity period enjoyed by the first generic to challenge a patent cannot be used as a bottleneck to prevent additional generic competition.'"

*Hi-Tech*, 587 F. Supp. 2d at 4 (citing 149 Cong. Rec. S15746 (daily ed. Nov. 24, 2003) (statement of Sen. Schumer)).

The mere fact that the Buprenorphine Film Guidance was issued after the first applicant submitted its ANDAs does not toll the 30-month tentative approval requirement, absent a showing that: "(1) FDA changed or reviewed (i.e., considered whether to change) the requirements for approval while the application was under review **and** (2) this change in, or review of, approval requirements was a cause of the failure to obtain tentative approval or final approval by the 30-month forfeiture date." *See* 180-Day Exclusivity Q&A Guidance at 22 (emphasis added); *see also* 21 U.S.C. § 355(j)(5)(D)(i)(IV) (stating that forfeiture for failure to obtain tentative approval within 30 months of ANDA submission is excused if that failure was "**caused by** a change in or a review of the requirements for approval" (emphasis added)); *Amneal Pharm. LLC v. FDA*, 285 F. Supp. 3d 328 (D.D.C. 2018) (finding that FDA acted within its authority when it determined that the first applicant forfeited its 180-day exclusivity period by failing to obtain tentative approval within 30 months and any delays were not caused by a change in "requirements for approval"). FDA, however, can make no such showing here. Not only did the Buprenorphine Film Guidance not make any change in the approval requirements, but Teva still has not obtained approval despite the fact that its ANDAs were submitted over four years ago and that the guidance was issued over three years ago.

By allowing Teva to maintain its exclusivity – in contravention of the plain language of the statue – FDA has effectively permitted Teva to park its exclusivity, potentially indefinitely. This blocks a ready and able ANDA filer, currently undertaking great expense and effort in patent litigation, from obtaining final approval. Thus, FDA is depriving the public of the benefit of a generic drug product, in contravention of the plain statutory language and Congress's intent

behind the MMA amendments to the Hatch-Waxman Act.  It is axiomatic that FDA must give effect to the intent of Congress as expressed in the plain meaning of the FDCA.  *See Chevron*, 467 U.S. at 842; *see also STI Pharma, LLC v. Azar*, No. 18-1231, 2020 WL 1332004, at *13 (D.D.C. Mar. 23, 2020) (setting aside CMS's decision because, when "the traditional tools of statutory interpretation—including the plain meaning of the text and the purpose of the statute—reveal a 'single right answer' to the meaning of the statute, that ends the matter" (internal citation omitted)); *Amarin Pharm. Ir. Ltd. v. FDA*, 106 F. Supp. 3d 196, 208-09 (D.D.C. 2015) (vacating FDA's decision because "the statute's text, structure, and purpose do not 'encompass' or 'permi[t]' the construction the Agency has given it").  And under *Chevron*, FDA's decision finding that Teva did not forfeit any entitlement to 180-day marketing exclusivity must be reversed.

The *Chevron* step one analysis is focused, first and foremost, on the text of the statute. "If the statute's meaning is unambiguous, then [this Court] need go no further."  *Eagle*, 952 F.3d at 330.  In interpreting the statute the court should "presume that the legislature says in a statute what it means and means in a statute what it says there."  *Id.* (quotations omitted).  Here, the FDCA unambiguously states that a First Applicant forfeits its 180-day exclusivity unless the delay is "caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed."  *See* 21 U.S.C. § 355(j)(5)(D)(i)(IV). There is no daylight in the statue for FDA to inject its own interpretation, and plainly, there has been no "change in or a review of the requirements for approval" of Teva's ANDAs that can be the "cause" of Teva's failure to timely obtain tentative approval, as discussed above.  The Court's inquiry under *Chevron* can and should end there.  *Eagle*, 952 F.3d at 330.

Notwithstanding the foregoing *Chevron* step one analysis, which should end this Court's inquiry, FDA may take the position that the FDCA's forfeiture provision for failure to timely obtain tentative approval is silent with respect to how much time a First Applicant can take, or the diligence required, to address the "change in or review of the requirements for approval" that "caused" the First Applicant to not obtain tentative approval within 30 months. *See* 21 U.S.C. § 355(j)(5)(i)(IV).  Thus, in determining whether to apply this FDCA provision, FDA may take the position that it can allow a First Applicant to take an indefinite amount of time to address the "change in or review of the requirements for approval."  But even under *Chevron* step two, FDA is entitled to no deference for such an interpretation because it would be "arbitrary, capricious, or manifestly contrary to the statute."  *Chevron*, 467 U.S. at 844.

Under *Chevron* step two, the court should defer to an agency's interpretation of a statute only if it is "based on a permissible construction of the statute."  *Id.* at 843.  Here, allowing a First Applicant to take advantage of FDA's identification of a purported change in or review of the requirements for approval as a cause of the applicant's failure to timely obtain tentative approval – and thus no forfeiture – by then parking its exclusivity runs contrary to the whole purpose of the MMA's forfeiture provisions.  Indeed, as discussed above, "[t]he forfeiture triggers were written into the statute to prevent first applicants from 'parking' their rights *by failing to act on their applications*, either due to a monetary 'pay-to-delay' settlement *or for other reasons*."  *Ranbaxy Labs.*, 82 F. Supp. 3d at 197 (emphasis added).  Here, FDA's failure to grant Alvogen final approval and find that Teva forfeited its 180-exclusivity would subvert Congress's intent behind enacting the MMA provisions.  The forfeiture provisions should be strictly construed to, among other things, safeguard the consumer from a First Applicant parking its 180-day exclusivity.  *Hi-Tech*, 587 F. Supp. 2d at 4 (citing 149 Cong. Rec. S15746 (daily ed.

Nov. 24, 2003)) ("Congress enacted the forfeiture provisions to 'ensure that the 180–day exclusivity period enjoyed by the first generic to challenge a patent cannot be used as a bottleneck to prevent additional generic competition.'") (statement of Sen. Schumer)).  Any such interpretation is contrary to the direct purpose of the MMA forfeiture provisions in preventing bottlenecks from allowing ready and able generic drug manufactures from bringing their lower cost alternatives to the market.

In sum, under a plain reading of the FDCA statute and in view of the facts outlined above, any 180-day exclusivity period has been forfeited by Teva, and Alvogen is likely to succeed on its claim that its ANDA should be granted final approval.  Moreover, any interpretation by FDA that allows it and Teva to indefinitely address whatever is has deemed a change in or review of approval requirements should be rejected as arbitrary, capricious, or manifestly contrary to the FDCA.  As such, the Court should grant Alvogen's preliminary injunction motion and order FDA to immediately grant Alvogen's ANDA final approval.

**B.   Teva Lost Any 180-Day Marketing Exclusivity Tied to Its Paragraph IV Certifications.**

Teva further lost its status as a First Applicant and forfeited any right to 180-day exclusivity as a result of (1) expiration of the '019 patent and (2) by virtue of a court order with respect to the '866 patent.

**1.   Teva Forfeited Any 180-Day Marketing Exclusivity Based on Its Paragraph IV Certification Against the '019  Patent.**

When Teva filed its qualifying Paragraph IV certifications in September and October 2016, the only patents listed in the Orange Book (that were not on the cusp of expiring[16]) were

---

[16] U.S. Patent No. 6,159,498 was also listed in the Orange Book at the time, but it expired on October 18, 2016.  Therefore, it was likely not the subject of a Paragraph IV certification by Teva.

the '866 patent and the '019 patent.  The '019 patent expired in January 2020, however, and thus

can no longer serve as a basis for exclusivity.  Specifically, the MMA amendments provide for

forfeiture of any 180-day marketing exclusivity tied to a Paragraph IV certification against a

patent when that patent has expired.[17]  *See* 21 U.S.C. § 355(j)(5)(D)(i)(VI).  As a result of this,

the only remaining Paragraph IV certification that could possibly confer 180-day marketing

exclusivity to Teva is its certification against the '866 patent.  But, as discussed below, Teva has

forfeited any right to 180-day exclusivity tied to that certification based on the court's order in

the *BDSI/Teva* cases.

**2.     Teva Failed to Lawfully Maintain Its
Paragraph IV Certification Against the '866
Patent and Should Have Withdrawn or Amended It.**

As discussed above, the court overseeing the patent litigation between Teva and BDSI

signed and entered an order in which Teva "acknowledged and agreed that the ['019 and '866

patents] are valid, enforceable, and infringed with respect to [Teva's ANDAs]."  *See, e.g.*,

Stipulation and Order of Dismissal, *BDSI/Teva*, No. 16-1303 (D. Del. Feb. 6, 2018), ECF No. 37

(Exhibit B at 2).  The court further ordered that "[a]ll claims and defenses . . . are hereby

dismissed, with prejudice" and that the parties "expressly waive[d] any right to appeal or

otherwise move for relief from" the parties' stipulation and court's order.  *Id.*

As FDA's regulations make clear:

> An applicant who has submitted a paragraph IV certification and is
> sued for patent infringement must submit an amendment to change
> its certification if a court enters a final decision from which no

---

[17] Although the Orange Book currently lists '843 and '539 patents for BELBUCA, neither of
those patents were listed (or even issued) when Teva submitted its first Paragraph IV
certifications in September 2016.  *See* Exhibits F and G (showing May 23, 2017 and February
27, 2018 issuance dates for the '843 and '539 patents, respectively).  As neither of these patents
was a patent that qualified Teva for exclusivity, even if Teva had amended its Paragraph IV
certification to cover them, the amended certification would not prevent forfeiture of exclusivity.
*See* 180-Day Exclusivity Q&A Guidance, at 18.

appeal has been or can be taken, or **signs and enters a settlement order or consent decree in the action that includes a finding that the patent is infringed**. . . .   In its amendment, the applicant must certify under paragraph (a)(12)(i)(A)(3) of this section that the patent will expire on a specific date or, with respect to a patent claiming a method of use, the applicant may instead provide a statement under paragraph (a)(12)(iii) of this section if the applicant amends its ANDA such that the applicant is no longer seeking approval for a method of use claimed by the patent. **Once an amendment for the change has been submitted, the ANDA will no longer be considered to contain a paragraph IV certification to the patent**.

21 C.F.R. § 314.94(a)(12)(viii)(A) (emphasis added).

When the court signed and entered the stipulated order with a finding that the patents were valid, enforceable, and infringed, Teva (1) no longer lawfully maintained its Paragraph IV certification to those patents and (2) should have converted its Paragraph IV certifications to Paragraph III certifications,[18] forfeiting any right to the 180-day exclusivity period. *See* 21 U.S.C. § 355(j)(5)(D)(i)(III) (first applicant forfeits when it "amends or withdraws the certification for all of the patents with respect to which that applicant submitted a certification qualifying the applicant for the 180-day exclusivity period").   "Where [a first applicant] lists a patent in a paragraph IV certification and loses in litigation through a judgment that confirms infringement and rejects invalidity, that applicant may no longer lawfully maintain its paragraph IV certification." *Apotex, Inc. v. Daiichi Sankyo, Inc.*, 781 F.3d 1356, 1363 (Fed. Cir. 2015).

FDA's regulations dictate that the court's action in signing and entering such an order requires that Teva amend its Paragraph IV certification to a Paragraph III certification.  *See* 21 C.F.R. § 314.94(a)(12)(viii)(A).  FDA is bound by those regulations because "[i]t is . . . clear beyond cavil that an agency acts arbitrarily and capriciously if it acts in a manner that is contrary

---

[18] A Paragraph III certification is one by which an ANDA applicant agrees to not market its product until the relevant patent expires. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(III).

to its own regulations or a congressional statute." *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018).  Indeed, "while an administrative agency can certainly 'amend or repeal its own regulations,' it is not free to 'ignore or violate its regulations while they remain in effect.'"  *Id.* (citation omitted); *see also In re MDL 2700 Genentech Herceptin (Trastuzumab) Mktg. & Sales Prac. Litig.*, 960 F.3d 1210, 1234 (10th Cir. 2020) ("Because the regulatory language resolves the question before us, we need not, and indeed cannot, . . . defer to the FDA's interpretation . . . .").

As such, FDA is bound by its regulations to require Teva to amend its Paragraph IV certification to a Paragraph III certification.  The court in the *BDSI/Teva* cases specifically entered an order that the '866 patent is valid, enforceable, and infringed, and that order can only be interpreted as "a settlement order or consent decree in the action that includes a finding that the patent is infringed . . . ."  21 C.F.R. § 314.94(a)(12)(viii)(A).  Moreover, the court dismissed all claims and defenses, including Teva's non-infringement and invalidity defenses, "with prejudice" and determined that the order was not appealable.  In doing so, the court "**ORDERED, ADJUDGED AND DECREED**" the parties' agreement resolving the action and, as such, there can be no question that what was entered is a settlement order or consent decree. *See, e.g.*, Stipulation and Order of Dismissal, *BDSI/Teva*, No. 16-1303 (D. Del. Feb. 7, 2018), ECF No. 38 (Exhibit B at 2) (emphases in original).  Given the clear mandate of FDA's regulations, Teva has failed to "lawfully maintain" its Paragraph IV certifications and thus no longer qualifies as the First Applicant.  *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb).  Moreover, by amending its Paragraph IV certification to a Paragraph III certification as it must do under FDA's regulations, Teva has forfeited any right to the 180-day exclusivity period.  *See* 21 U.S.C. § 355(j)(5)(D)(i)(III).

Admittedly, public information indicates that Teva has likely taken a non-exclusive license to the '866 patent.[19]  And while FDA's guidance states that "an ANDA applicant's agreement that the qualifying patent is valid and would be infringed in the course of securing a license [does not] require the applicant to change the paragraph IV certification," its reference to "in the course of securing a license" is to an agreement in license documents – not a court order. *See* 180-Day Exclusivity Q&A Guidance at 19.  Any other interpretation by FDA would run contrary to the FDCA and FDA's regulation.  *See* 21 C.F.R. § 314.94(a)(12)(viii)(A) ("[I]f a court . . . signs and enters a settlement order or consent decree in the action that includes a finding that the patent is infringed, . . . the applicant must" amend its Paragraph IV certification).  "'It is a well settled rule that an agency's failure to follow its own regulations is fatal to the deviant action.'" *Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 83-84 (quoting *Mine Reclamation Corp. v. FERC*, 30 F.3d 1519, 1525 (D.C. Cir. 1994)).

Moreover, Teva knows how to lawfully maintain and not have to amend its Paragraph IV certification.  For example, Teva recently settled a matter between it and another NDA holder. In entering into a consent judgment there, Teva agreed to a provision that "nothing in [the] Consent Judgment prohibits Teva . . . from maintaining 'Paragraph IV Certification'" in light of Teva taking a license to the patent.  *See* Consent Judgment, *Merck Sharp & Dohme Corp. v. Teva Pharm. USA, Inc.*, No. 19-318 (D. Del. Nov. 10, 2020), ECF No. 186.  Notably, Teva did not acknowledge validity, enforceability, and infringement of the patent there.  *Id.*  And Teva has entered into similar judgments in multiple cases where it has maintained its Paragraph IV

---

[19] *See* BioDelivery Sciences Announces BELBUCA® Patent Litigation Settlement Agreement with Teva, *available at* https://www.globenewswire.com/news-release/2018/02/06/1333512/0/en/BioDelivery-Sciences-Announces-BELBUCA-Patent-Litigation-Settlement-Agreement-with-Teva.html (last visited Mar. 10, 2021).

certifications, while not acknowledging the validity, enforceability, and infringement of the relevant patents.  *See, e.g.*, Stipulated Consent Judgment and Injunction, *Bausch Health Ir. Ltd. v. Teva Pharm. USA, Inc.*, No. 19-12404 (D.N.J. Mar. 23, 2020), ECF. No. 35 (same); Consent Judgment and Order of Permanent Injunction, *Sucampo AG v. Teva Pharm. USA, Inc.*, No. 17-7451 (D.N.J. Sept. 19, 2018), ECF No. 31 (same); Consent Judgment, *Boehringer Ingelheim Pharm. Inc. v. HEC Pharm Co., Ltd.*, No. 15-5982 (D.N.J. May 8, 2018), ECF No. 523 (same). Yet, here, Teva agreed to language in the court's settlement order for its action against BDSI with an express finding that the patents were valid, enforceable, and infringed with no mention of maintaining its Paragraph IV certification in light of taking a license.  *See, e.g.*, Stipulation and Order of Dismissal, *BDSI/Teva*, No. 16-1303 (D. Del. Feb. 7, 2018), ECF. No. 38 (Exhibit B at 2).

In view of Teva's failure to "lawfully maintain[] a certification described in paragraph (2)(A)(vii)(IV)," i.e., its Paragraph IV certification (*see* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb)), and the requirement to amend its Paragraph IV certification to a Paragraph III certification, Teva is no longer entitled to the 180-day exclusivity period.  *See* 21 C.F.R. § 314.94(a)(12)(viii)(A) (stating that an ANDA applicant that has submitted a Paragraph IV certification must change it to a Paragraph III certification "if a court enters a final decision from which no appeal has been or can be taken, or signs and enters a settlement order or consent decree in the action that includes a finding that the [relevant] patent is infringed"); 21 U.S.C. § 355(j)(5)(D)(i)(III) (stating that a First Applicant forfeits any entitlement to exclusivity if it amends or withdraws its Paragraph IV certifications to the relevant patents); *Apotex*, 781 F.3d at 1363 n.3 ("The required application amendment causes the first filer to forfeit its eligibility for any market exclusivity based on that certification.").

26

For this separate reason, Alvogen is likely to succeed on its claim that its ANDA should be granted final approval. As such, FDA's refusal to grant final approval to Alvogen should be reversed as contrary to statute and FDA's regulations, and FDA should be ordered to grant final approval to Alvogen's ANDA without further delay.

## II.   ALVOGEN WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE RELIEF FROM THIS COURT.

Alvogen is already suffering and will continue to suffer, unquantifiable, intangible harm if FDA does not grant its ANDA final approval. Absent Court action ordering FDA to approve Alvogen's ANDA, Alvogen cannot launch its generic Buprenorphine Film products. *See* Zaku Decl. ¶ 11. Indeed, there are currently no other generic Buprenorphine Film products on the market, and Teva is enjoined from entering the market until 2027 (should it ever obtain FDA approval). *Id.*; Stipulation and Order of Dismissal, *BDSI/Teva*, No. 16-1303 (D. Del. Feb. 7, 2018), ECF No. 38 (Exhibit B at 2). Alvogen is the only ANDA filer who has obtained tentative approval and thus is the only company that can market a generic Buprenorphine Film product immediately after FDA's wrongful decision preserving Teva's exclusivity is reversed. Every day that FDA's improper delay of Alvogen's final approval remains is costing Alvogen its first mover advantage into this market. *See* Zaku Decl. ¶ 13. This includes the opportunity to establish unique and lasting customer relationships, to enhance its reputation, and to gain significant and enduring market share and revenues. *Id.* These losses are neither easily measurable nor compensable through money damages. Without Court action, Alvogen will be denied this advantage and irreparably harmed.

### A.   Alvogen Will Be Irreparably Harmed by the Loss of Its First-Mover Advantage.

With Teva enjoined from marketing its ANDA products until 2027 and no other generic Buprenorphine Film ANDA holder yet with tentative approval, Alvogen can enjoy a significant

first-mover advantage as the only generic alternative on the market. "[T]he earliest generic drug manufacturer in a specific market has a distinct advantage over later entrants." *Mova*, 140 F.3d at 1066. This advantage is significant because it "can never be fully recouped through money damages or by 'playing catch-up.'" *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997). In fact, courts consistently recognize the unique value of the first-mover advantage, acknowledge the irreparable harm that a party suffers when improperly denied that advantage, and grant preliminary injunctions to remedy the harm. *See, e.g.*, *id.* at 29 (issuing a preliminary injunction where "'an officially sanctioned head start in the market' for a discrete pharmaceutical product will cause irreparable injury to the company that is left behind") (citing *Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128 at 130-31); *TorPharm, Inc. v. Shalala*, No. 97-1925, 1997 WL 33472411, at *4 (D.D.C. Sep. 15, 1997) (issuing a preliminary injunction where the plaintiff would "be permanently disadvantaged in the market" because "timely entry into the market is critical for success").

Here, the loss of the first-mover advantage for Buprenorphine Film will seriously injure Alvogen. *See* Zaku Decl. ¶ 14. The *de facto* marketing exclusivity period Alvogen would enjoy provides critical access to important Buprenorphine Film customers that otherwise would not be available. *Id.; see also Teva Pharm., USA, Inc. v. FDA*, 182 F.3d at 1011 n.8 (later-entering generic manufacturers "face continued harm because of their denied access to the market . . . , harm potentially heightened because of [a first applicant's] period of market exclusivity."). Because these opportunities differ vastly from customer to customer, their loss is extremely difficult to quantify. *See* Zaku Decl. ¶ 13; *see also Pharmacia & Upjohn Co. v. Ranbaxy Pharm., Inc.*, 274 F. Supp. 2d 597, 614 (D.N.J. 2003) (finding irreparable harm in part due to the "speculative nature of damage assessments"), *aff'd in relevant part*, 85 F. App'x 205 (Fed. Cir.

2003).  These opportunities are, however, extremely significant to Alvogen, and their loss would cause substantial and irreparable harm.  *See* Zaku Decl. ¶ 11, 13; *see also Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008) (holding that, although "loss of market opportunities cannot be quantified or adequately compensated," they nevertheless constitute "evidence of irreparable harm") (internal citations omitted).

In addition, wrongfully denying Alvogen its first-mover advantage will deprive Alvogen of its best opportunity to earn and maintain market share for Buprenorphine Film, a harm that is difficult to calculate precisely.  *See* Zaku Decl. ¶ 14; *see also Albany Molecular Rsch., Inc. v. Dr. Reddy's Labs., Ltd.*, No. 09-4638, 2010 WL 2516465, at *10-11 (D.N.J. June 14, 2010) (concluding that harms such as lost market share and price erosion are difficult to quantify and irreparable).  As a first generic entrant marketing an ANDA product, Alvogen will be able to gain a significant share of the generic Buprenorphine Film market during the exclusivity period. *See* Zaku Decl. ¶¶ 13-14.  Even after other generic competitors enter the market, Alvogen expects that it would be able to maintain a significantly larger market share than its competitors due to its head start.  *Id.* ¶ 15.  This enduring market share results from a combination of access to better customers and the long-term nature of many purchasing arrangements.  *Id.*; *see also TorPharm*, 1997 WL 33472411, at *4.  There will be no way to replicate this market dynamic if other generics obtain final approval at the same time as Alvogen and are able to launch their ANDA products on the market with Alvogen by the time this Court reaches the merits of this case.  *See* Zaku Decl. ¶ 15.

At least one other generic drug manufacturer, Chemo Research, S.L., has submitted an ANDA for Buprenorphine Film in five out of the seven strengths for which Alvogen also seeks

approval.[20]  Complaint for Patent Infringement, *BioDelivery Sci. Int'l, Inc. v. Chemo Rsch., S.L.*, No. 19-444 (D. Del. Mar. 1, 2019), ECF No. 1.  Chemo Research's ANDA has been on file since at least sometime in January 2019, and the August 1, 2021 expiration of the 30-month stay on its approval is fast approaching.  Supplemental Information for Patent Cases Involving an Abbreviated New Drug Application (ANDA), *BioDelivery Sci. Int'l, Inc. v. Chemo Rsch., S.L.*, No. 19-444 (D. Del. Mar. 1, 2019), ECF No. 3.  Chemo's ANDA could, consequently, obtain tentative approval any day now.  Every day this Court delays and FDA's wrongful decision is left in place is, therefore, another day of irreparable harm to Alvogen because its window to be the only generic Buprenorphine Film on the market begins to close.

Being one of the first companies to offer a generic Buprenorphine Film ANDA product will also allow Alvogen to generate substantial goodwill with existing and prospective customers.  *See* Zaku Decl. ¶ 16.  The generic drug business is highly competitive, and a small number of wholesalers account for the majority of generic drug purchases from manufacturers in the United States.  *Id.*  These large purchasers prize the ability to offer newly-available generic drugs to their own customers.  *Id.*  As a result, they often aggressively pursue relationships with generic first-movers.  *Id.*  Alvogen's ability to enter the market as the only generic alternative provides it with a unique opportunity to establish and strengthen its relationships with these key customers through their interest in stocking generic Buprenorphine Film as soon as it is available.  *Id.*  Moreover, generic companies like Alvogen rely on bringing their products to market as soon as possible as a way to maintain their reputation as top-tier generic

---

[20] Chemo Research's ANDA does not seek approval for the 600 mcg and 750 mcg strengths. Complaint for Patent Infringement, *BioDelivery Sci. Int'l, Inc. v. Chemo Rsch., S.L.*, No. 19-444 (D. Del. Mar. 1, 2019), ECF No. 1 ¶ 34.

manufacturers.  *Id.*  Launching one of the first generic Buprenorphine Film products will therefore enhance Alvogen's well-earned reputation in this area.  *Id.*

The many intangible benefits of being a first-mover will be irretrievably lost if this Court does not act to enjoin FDA's wrongful denial of final approval of Alvogen's ANDA products. *Id.* ¶¶ 14-17.  Irreparable harm will result if Alvogen's final approval continues to be delayed and occurs at the same time as other competing generic Buprenorphine Film ANDA products. *Id.* ¶ 18. Unless an injunction issues, Alvogen's ability to gain important access to customers and enter long-lasting relationships with those customers will be lost.  Thus, Alvogen is being and will continue to be irreparably harmed.

**B.**     **Alvogen Will Suffer Substantial and Unrecoverable Economic Loss.**

Alvogen will also suffer substantial, unrecoverable economic loss if FDA continues to withhold final approval.  FDA itself recognizes "the highly competitive nature of the generic drug approval process and the possibility of substantial profits for the recipient" of marketing exclusivities.  *See Guidance for Industry, 180-Day Exclusivity When Multiple ANDAs Are Submitted on the Same Day* (July 2003).[21]  If Alvogen were allowed to promptly enter the market, as it expected to do on January 30, 2021, it would have obtained a significant share of the market for Buprenorphine Film, sales of which by BDSI exceeded $136,120,000 in 2020. *See* Exhibit A at F-26.  In fact, Alvogen estimates that it will be able to generate sales of over $10 million per month for its Buprenorphine Film product.  *See* Zaku Decl. ¶ 13.  And Alvogen will only be able capture this substantial market opportunity now before other generic Buprenorphine Film products are approved.  *Id.* ¶¶ 13-16.  Thus, the practical effect of FDA's

---

[21] *Available at* https://www.fda.gov/media/71304/download (last visited Mar. 10, 2021).

erroneous decision to not approve Alvogen's ANDA approval, if left unchecked, will be to diminish much of the economic value of Alvogen's product. *Id.* ¶¶ 19, 20.

Alvogen also made a substantial investment in its generic Buprenorphine Film product, including diligently seeking and obtaining tentative approval within 13 months of its ANDA's submission, taking on the risks and costs of patent litigation, establishing a production process, and building up significant inventories of Buprenorphine Film, with the expectation that FDA would properly award it final approval at the expiration of the 30-month stay on January 30, 2021. *Id.* ¶ 17. Such investment by Alvogen will be significantly diminished if FDA continues to deny Alvogen final approval.

If Alvogen continues to be delayed in obtaining final approval, and absent preliminary relief, it will be impossible to recoup this investment. During the time period that this case would likely run, Chemo Research may obtain tentative approval and become similarly situated to Alvogen and ready to enter the market at the same time as Alvogen. The market price for Buprenorphine Film would dramatically and permanently decrease. Further, even if this Court ultimately determines that final approval of Alvogen's ANDA should not be further delayed, because a given Buprenorphine Film prescription can be filled only once, it would be impossible for Alvogen to "make up" for a lost sale by filling a subsequent prescription. *Id.* ¶ 20. Alvogen's economic losses, therefore, are unmistakably irreparable.

This Court has held that economic loss may be irreparable when it cannot be recovered and when the effect of that loss on the plaintiff is serious. *Mova*, 955 F. Supp. at 131; *see also Bracco Diagnostics*, 963 F. Supp. at 29. Without a preliminary injunction, Alvogen has no legal recourse either against FDA or against a competitor entering the market at the same time as Alvogen. *See Mylan Pharm., Inc. v. Thompson*, 268 F.3d 1323, 1332 (Fed. Cir. 2001) (holding

that FDCA does not create a private right of action).  Furthermore, even if Alvogen did have a

private right of action, it would still be unable to recover monetary damages due to FDA's

immunity, a factor that courts in this Circuit have used to find monetary harm irreparable and

weighed in favor of an injunction.  *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008)

("where, as here, the plaintiff in question cannot recover damages from the defendant due to the

defendant's sovereign immunity . . . any loss of income suffered by a plaintiff is irreparable *per

se*" (internal citations omitted)).  Without the requested preliminary relief, therefore, the direct

economic value of the exclusivity period will be irretrievably lost.

In sum, unless this Court acts, Alvogen will forever lose the opportunity to: (1) gain

important access to key customers; (2) generate goodwill through a first-to-market offering;

(3) enter long-term relationships with customers; and (4) directly capture the economic benefit of

the first-mover advantage.  Alvogen has no adequate remedy at law to recoup these losses and

will consequently be irreparably harmed if this Court does not enter a preliminary injunction in

this case.

III.    **GRANTING THE PRELIMINARY INJUNCTION
        WILL NOT SUBSTANTIALLY INJURE ANY OTHER PARTY.**

In contrast to the significant and irreparable harm that Alvogen will suffer absent

preliminary relief, enjoining Defendants from wrongfully depriving Alvogen of receiving final

approval would not cause substantial injury to FDA or any other party.  First, FDA has no

financial stake in the outcome of this case.  Rather, FDA has an interest in the correct

implementation of the FDCA and in the establishment of clear rules to guide the generic

pharmaceutical industry.  *See* 21 U.S.C. § 393 (describing one of the objectives of FDA's agency

plan as "maximizing the availability and clarity about the process for review of applications and

submissions . . . made under [the FDCA]"); *see also* 65 Fed. Reg. 67,012, 67,013 ("To

strengthen its performance, FDA developed partnerships with stakeholders and stimulated

cooperation and partnership by making its activities more understandable and accessible to

stakeholders"); *Bracco Diagnostics*, 963 F. Supp. at 30 ("[r]equiring [FDA] to act lawfully is

also very much in the public interest."); *Whitaker v. Thompson*, 248 F. Supp. 2d 1, 16 (D.D.C.

2002) ("[I]t is clearly in the public interest to ensure that governmental agencies, such as the

FDA, fully comply with the law.").  The resolution of this suit promotes those interests.

There is likewise little risk of substantial harm to other Buprenorphine Film ANDA filers,

even if the court were to ultimately determine that FDA is entitled to withhold final approval of

Alvogen's ANDA.  Teva has entered into an agreement with BDSI that keeps Teva's product off

the market until 2027, and no other ANDA applicants for Buprenorphine Film have obtained

tentative approval.  *See* Exhibit E (Drugs@FDA entry for buprenorphine hydrochloride showing

no Buprenorphine Film ANDAs besides Alvogen's having tentative approval).  By contrast, if an

injunction does not issue, Alvogen would never be able to capture the full market currently

available to it, and the unique benefits of being the first movant would be forever lost.  Where a

plaintiff will suffer substantial irreparable harm without the entry of an injunction and other

parties will merely remain situated as before, courts have not hesitated to find that the balance of

harms tip decidedly in favor of an injunction.  *See, e.g.*, *N.S. v. Hughes*, 335 F.R.D. 337, 355

(D.D.C. 2020) (where there is harm to a plaintiff but"[t]here is no harm to the other interested

parties . . . [this] factor thus turns in plaintiff's favor, meaning that a preliminary injunction is

warranted").  That is the case here, as well.

## IV.    PRELIMINARY RELIEF WILL FURTHER THE PUBLIC INTEREST.

Granting Alvogen's motion for a preliminary injunction will further the public interest by

allowing vigorous generic competition with the brand product that will lower prices for patients

and payors.  Generic entry serves the public interest by providing consumers increased access to

cheaper, safe generic drugs.  The FDCA is structured to give incentives to companies to file ANDAs so that lower-cost generic drugs are brought to market as soon as possible.  "[T]he public has an interest in receiving the benefit of ANDA-approved generic drugs as soon as those products can lawfully come to market."  *Pharmacia & Upjohn Co.*, 274 F. Supp. 2d at 614, *aff'd in relevant part*, 85 F. App'x 205 (Fed. Cir. 2003); *see also TorPharm*, 1997 WL 33472411, at *5 ("The public interest in competition and in the correct application of the [FDCA] favors issuance of the injunction.").  The Hatch-Waxman Act was implemented "'to speed the introduction of low-cost generic drugs to market,' thus increasing competition and, theoretically, lowering prices."  *Ranbaxy Labs., Ltd v. Burwell*, 82 F. Supp. 3d at 164 (quoting *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S (Caraco)*, 566 U.S. 399, 405 (2012)) (internal citations omitted).  And Congress designed the forfeiture provisions of the MMA amendments to prevent the "parking" of exclusivity that could "be used as a bottleneck to prevent additional generic competition.'"  *Hi-Tech*, 587 F. Supp. 2d at 4.

Having Alvogen's ANDA product on the market at this time will lead to lower prices for patients and payors, which will benefit the public and satisfy the intent of the FDCA.  In fact, in passing the Hatch-Waxman Act, "Congress sought to get generic drugs into the hands of patients at reasonable prices – fast."  *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991).  Removing the bottleneck improperly imposed by FDA will also ensure that patients can have expanded access to an opioid that has less abuse and addiction potential compared to other opioids, such as oxycodone, fentanyl, hydrocodone, and morphine, which is especially beneficial in light of the ongoing opioid epidemic in the United States.  *See* 21 U.S.C. § 812(b)(2), (3).

Further, ensuring that FDA treats all ANDA applicants the same and interprets the FDCA properly in this case is similarly beneficial to the public.  *See Bracco Diagnostics*, 963 F. Supp.

at 30 ("[r]equiring [FDA] to act lawfully is also very much in the public interest."); *Whitaker*,

248 F. Supp. 2d at 16 ("[I]t is clearly in the public interest to ensure that governmental agencies,

such as the FDA, fully comply with the law.").  It is therefore necessary and appropriate for this

Court to reverse FDA's decision here and order FDA to grant final approval to Alvogen's

ANDA.

## CONCLUSION

For the foregoing reasons, Alvogen respectfully requests that this Court enter a

preliminary injunction directing Acting Secretary Cochran, Acting Commissioner Woodcock and

the United States Food and Drug Administration to grant Final Approval to Alvogen's ANDA,

as set forth in the Proposed Order submitted herewith.


 Dated:  March 12, 2021                          Respectfully submitted,

                                                 */s/ Chad A. Landmon*
                                                 Chad A. Landmon (DC Bar No. 990347)
                                                 AXINN, VELTROP & HARKRIDER LLP
                                                 90 State House Square
                                                 Hartford, CT 06103
                                                 T: (860) 275-8100
                                                 F: (860) 275-8101
                                                 clandmon@axinn.com

                                                 Aziz Burgy (DC Bar No. 483517)
                                                 Christopher M. Gallo (DC Bar No. 1030598)
                                                 AXINN, VELTROP & HARKRIDER LLP
                                                 950 F Street NW, 7th Floor
                                                 Washington, DC 20004
                                                 T: (202) 912-4700
                                                 F: (202) 912-4701
                                                 aburgy@axinn.com
                                                 cgallo@axinn.com

                                                 *Attorneys for Plaintiffs Alvogen, Inc., Alvogen*
                                                 *PB Research and Development LLC, and*
                                                 *Alvogen Malta Operations Ltd.*