**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ALVOGEN, INC., ALVOGEN PB
RESEARCH AND DEVELOPMENT LLC,
and ALVOGEN MALTA OPERATIONS
LTD.,

> *Plaintiffs*,

v.

XAVIER BECERRA,
Secretary of Health and Human Services,

JANET WOODCOCK, M.D.,
Acting Commissioner of Food and Drugs,

> and

UNITED STATES FOOD AND DRUG
ADMINISTRATION,

> *Defendants*,

> and

TEVA PHARMACEUTICALS USA, INC.

> *Intervenor-Defendant*.

Civil Action No. 21-672-ABJ



**REDACTED - PUBLIC VERSION**

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFFS' COMBINED MOTION FOR**
**A PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

I.      Generic Drug Entry: The Statutory Framework ........................................... 4

II.     New and Abbreviated Drug Application Requirements ................................ 5

III.    First Applicant Status and 180-Day Exclusivity......................................... 6

IV.     Forfeiture of 180-Day Exclusivity .............................................................. 7

STATEMENT OF FACTS ........................................................................................ 9

I.      Teva's First-Filed ANDA ............................................................................ 9

        A.      The Filing of Teva's ANDAs and Related Litigation........................... 10

        B.      The Administrative History of Teva's ANDA and the FDA Teva Decision........ 12

II.     Alvogen's ANDA and FDA's Refusal to Grant It Final Approval ................ 16

        A.      Alvogen's Requests for Final Approval of Its ANDAs ....................... 16

        B.      The FDA Response Memo................................................................... 17

ARGUMENT ........................................................................................................... 18

I.      Legal Standards........................................................................................... 18

II.     The Court Can and Should Review FDA's Determination. ......................... 20

III.    FDA's Decision to Deny Final Approval to Alvogen's ANDA Is Contrary to Law........ 22

        A.      Teva Failed to Obtain Tentative Approval of Its ANDAs Within 30 Months, and Teva's Failure Was Not Caused by FDA's Identified Change in Approval Requirements. ..................................................................... 23

                1.      Teva Undisputedly Missed the 30-Month Deadline to Obtain Tentative Approval. .......................................................... 23

                2.      Teva's Failure to Obtain Tentative Approval Was Not Caused by the Change in BELBUCA Labeling. ....................................... 24

                3.      FDA's Decision Allowing Teva Unlimited Time to Obtain Tentative Approval is Arbitrary and Capricious..................................... 28

                4.      FDA's Decision Allowing Teva to Park its Exclusivity Subverts Congressional Intent and Should Be Reversed under *Chevron*. .............. 29

B.      Teva Lost Any 180-Day Marketing Exclusivity Tied to Its Paragraph IV Certifications. ........................................................................................... 32

        1.      Teva No Longer Legally Maintained Its Paragraph IV Certifications When It Entered Into the Stipulation Order. ..................... 32

        2.      Teva Knew How to Avoid 180-Day Marketing Exclusivity Forfeiture But Failed to Do So............................................................. 35

        3.      The Relevant FDA Regulations Support the Forfeiture of Teva's 180-Day Marketing Exclusivity............................................... 36

IV.    FDA's Unlawful Decision Is Ripe for Review by This Court Because Alvogen Is Being Significantly Harmed. ....................................................................... 39

        A.      Alvogen Will Be Substantially and Irreparably Harmed by the Loss of Its First-Mover Advantage. ....................................................................... 40

        B.      Alvogen Will Suffer Substantial and Unrecoverable Economic Loss.................. 43

CONCLUSION............................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008)............................................................................41

*Albany Molecular Rsch., Inc. v. Dr. Reddy's Labs., Ltd.*,
    No. 09-4638, 2010 WL 2516465 (D.N.J. June 14, 2010).....................................41

*Am. Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001) ..........................................................................19

*Amarin Pharm. Ir. Ltd. v. FDA*,
    106 F. Supp. 3d 196 (D.D.C. 2015) ....................................................................29

*Amneal Pharm. LLC v. FDA*,
    285 F. Supp. 3d 328 (D.D.C. 2018) ....................................................................27

*Apotex, Inc. v. Daiichi Sankyo, Inc.*,
    781 F.3d 1356 (Fed. Cir. 2015)......................................................................34, 36

*Bracco Diagnostics, Inc. v. Shalala*,
    963 F. Supp. 20 (D.D.C. 1997) ........................................................23, 40, 41, 44

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council*,
    467 U.S. 837 (1984).........................................................................4, 23, 29, 30

*Dongkuk Int'l, Inc. v. U.S. Dep't of Justice*,
    204 F. Supp. 3d 18 (D.D.C. 2016) ......................................................................18

*Eagle Pharm., Inc. v. Azar*,
    952 F.3d 323 (D.C. Cir. 2020) ..........................................................4, 29, 30, 32

*HealthAlliance Hosps., Inc. v. Azar*,
    346 F. Supp. 3d 43 (D.D.C. 2018) ........................................................................4

*Hi-Tech Pharmacal Co. v. FDA*,
    587 F. Supp. 2d 1 (D.D.C. 2008) ................................................................. *passim*

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019).........................................................................................33

*In re MDL 2700 Genentech Herceptin (Trastuzumab) Mktg. & Sales Prac. Litig.*,
    960 F.3d 1210 (10th Cir. 2020) ..........................................................................34

*Mylan Pharm., Inc. v. Thompson*,
    268 F.3d 1323 (Fed. Cir. 2001)..................................................................................44

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    440 F.3d 459 (D.C. Cir. 2006) ...........................................................................20, 39

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Human Servs.*,
    313 F. Supp. 3d 62 (D.D.C. 2018) ..........................................................................34

*Pub. Citizen Health Rsch. Grp. v. FDA*,
    704 F.2d 1280 (1983)...............................................................................................37

*Ranbaxy Labs., Ltd v. Burwell*,
    82 F. Supp. 3d 159 (D.D.C. 2015) .......................................................................8, 30

*Reckitt Benckiser Inc. v. EPA*,
    613 F.3d 1131 (D.C. Cir. 2010) ..........................................................................20, 40

*SAS Inst., Inc. v. Iancu*,
    138 S. Ct. 1348 (2018) .............................................................................................31

*STI Pharma, LLC v. Azar*,
    No. 18-1231, 2020 WL 1332004 (D.D.C. Mar. 23, 2020) ......................................29

*Stuttering Found. of Am. v. Springer*,
    498 F. Supp. 2d 203 (D.D.C. 2007) ........................................................................20

*Teva Pharm., USA, Inc. v. FDA*,
    182 F.3d 1003 (D.C. Cir. 1999) ..........................................................................28, 41

*Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*,
    482 F.3d 1330 (Fed. Cir. 2007).................................................................................5

*Teva Pharm. USA, Inc. v. Sebelius*,
    595 F.3d 1303 (D.C. Cir. 2010) ..............................................................................21

*TorPharm, Inc. v. Shalala*,
    No. 97-1925, 1997 WL 33472411 (D.D.C. Sep. 15, 1997) .........................21, 41, 42

*Weinberger v. Hynson, Westcott & Dunning, Inc.*,
    412 U.S. 609 (1973).................................................................................................38

*Whitaker v. Thompson*,
    248 F. Supp. 2d 1 (D.D.C. 2022) ............................................................................23

**Statutes**

5 U.S.C. § 702...............................................................................................................19

5 U.S.C. § 704 ...................................................................................................................20

5 U.S.C. § 706 ...................................................................................................................19

21 U.S.C. § 355(a), (b) .......................................................................................................5

21 U.S.C. § 355(a), (j) ........................................................................................................5

21 U.S.C. § 355(b)(1) .........................................................................................................5

21 U.S.C. § 355(j)(2)(A)(v) ........................................................................................12, 26

21 U.S.C. § 355(j)(2)(A)(vii) .............................................................................................6

21 U.S.C. § 355(j)(2)(A)(vii)(II) ......................................................................................11

21 U.S.C. § 355(j)(2)(A)(vii)(III) .....................................................................................33

21 U.S.C. § 355(j)(2)(A)(vii)(IV) .......................................................................................1

21 U.S.C. § 355(j)(2)(B)(iii) ...............................................................................................6

21 U.S.C. § 355(j)(5)(B)(iii) ...............................................................................................6

21 U.S.C. § 355(j)(5)(B)(iv) ............................................................................................6, 7

21 U.S.C. § 355(j)(5)(B)(iv)(II)(aa), (bb) ..........................................................................2

21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb) .......................................................................... *passim*

21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA) .........................................................................20

21 U.S.C. § 355(j)(5)(D)(i) ..................................................................................................2

21 U.S.C. § 355(j)(5)(D)(i)(I)–(VI) ....................................................................................8

21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(AA) ......................................................................21, 40

*21 U.S.C. § 355(j)(5)(D)(i)(III) ...................................................................9, 33, 35, 36

*21 U.S.C. § 355(j)(5)(D)(i)(IV) ............................................................................... *passim*

21 U.S.C. § 355(j)(5)(D)(i)(VI) ........................................................................................11

21 U.S.C. § 355(q)(1)(G) ..................................................................................................24

21 U.S.C. § 812(b)(2) ..................................................................................................10, 23

21 U.S.C. § 812(b)(3) ..................................................................................................10, 23

**Other Authorities**

21 C.F.R. § 314.3(b) ...............................................................................................13, 20

21 C.F.R. § 314.53 ............................................................................................................5

21 C.F.R. § 314.94(a)(12)(i)(A)(4) ...................................................................................6

21 C.F.R. § 314.94(a)(12)(i)(A)(4)(i) ...............................................................................6

*21 C.F.R. § 314.94(a)(12)(v) ...........................................................................18, 37, 38

*21 C.F.R. § 314.94(a)(12)(viii)(A) ........................................................................ *passim*

21 CFR 314.110(b) .........................................................................................................14

*80 Fed. Reg. 6802, 6844 (Feb. 6, 2015) .......................................................................38

*81 Fed. Reg. 69,580, 69,614 (Oct. 6, 2016) .................................................................38

A. SCALIA & B. GARNER, *Reading Law: The Interpretation of Legal Texts* 180
    (2012) ..........................................................................................................................37

Erika Lietzan & Julia Post, *The Law of 180-Day Exclusivity*, 71 FOOD & DRUG
    L.J. 327, 361 (2016) ...................................................................................................39

*Guidance for the Industry, 180-Day Exclusivity: Questions and Answers, Draft
    Guidance* ("180-Day Exclusivity Q&A Guidance") (Jan. 2017) at 22 ................24, 27, 31, 32

Per the Court's Minute Order of March 16, 2021, Plaintiffs Alvogen, Inc., Alvogen PB Research and Development LLC, and Alvogen Malta Operations Ltd. (collectively, "Alvogen") hereby move under Rule 65(a)(2) of the Federal Rules of Civil Procedure for a preliminary injunction consolidated with a consideration of this case on the merits via a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h).

## INTRODUCTION

On May 23, 2018, the Food and Drug Administration ("FDA") received Abbreviated New Drug Application ("ANDA") No. 211594 ("Alvogen's ANDA") from Alvogen PB Research and Development LLC, acting as the U.S. agent for Alvogen Malta Operations Ltd.,[1] seeking approval to market generic buprenorphine buccal film in dosage strengths 75 mcg, 150 mcg, 300 mcg, 450 mcg, 600 mcg, 750 mcg, and 900 mcg ("Alvogen's ANDA Product"). (AR at FDA-000257.)[2]  Just slightly more than one year after submission, on June 12, 2019, FDA granted tentative approval to Alvogen's ANDA, finding that Alvogen's product met all of the requirements for obtaining final approval but delaying final approval because of a 30-month stay in place at that time.  (AR at FDA-000297-302.)

In anticipation of the 30-month stay's expiration, Alvogen requested final approval on January 30, 2021.  (AR at FDA-000262.)  Alvogen expected final approval because publicly available information indicated that the "first" applicant,[3] Intervenor-Defendant Teva

---

[1] Alvogen, Inc. is the marketing agent for Alvogen's ANDA Product.

[2] AR refers to the Administrative Record.

[3] A "first applicant" is an ANDA applicant that was the first to submit a substantially complete ANDA containing a certification under 21 U.S.C. § 355(j)(2)(A)(vii)(IV) (a "Paragraph IV Certification") for a patent listed in FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly known as the "Orange Book") for the Reference Listed Drug.  *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb).  If the "first applicant" lawfully maintains its

Pharmaceuticals USA, Inc. ("Teva"), had forfeited any entitlement to the 180-day exclusivity period.[4]  (AR at FDA-000262-63.)  Yet, in response, FDA sent another tentative approval letter, citing "exclusivity issue[s]" as a reason for withholding final approval.  (AR at FDA-000257.)  FDA stated that Alvogen's "ANDA will be eligible for final approval on the date that is 180 days after" Teva begins to commercially market its product.  (AR at FDA-000258.)

The basis for FDA's conclusions in the tentative approval letter was a decision, made by FDA on January 28, 2021, that Teva remained entitled to the 180-day exclusivity period.  (AR at FDA-000001-09; hereinafter, "FDA Teva Decision".)  FDA reaffirmed this position in a March 10, 2021 internal memo that was drafted in part to respond to correspondence from Alvogen's counsel following the tentative approval letter.  (AR at FDA-000010-12; hereinafter, "FDA Response Memo".)  But, FDA's decision that Teva is entitled to 180-day marketing exclusivity – and thus Alvogen is not eligible to immediately receive final approval – is arbitrary, capricious, and contrary to law.  Indeed, Teva has forfeited any entitlement to 180-day marketing exclusivity for at least two reasons.

First, Teva undisputedly failed to obtain approval (tentative or final) within 30 months of filing its ANDAs, and "the failure [was not] *caused by* a change in or a review of the requirements for approval of the application imposed after the date on which the application [wa]s filed."  *See* 21 U.S.C. § 355(j)(5)(D)(i)(IV) (emphasis added).  Although the FDA Teva Decision cites to a change in the labeling requirements that Teva had not yet responded to by the tentative approval deadline, it is indisputable that this easily correctable change was not the

---

Paragraph IV Certification, it is entitled to a 180-day marketing exclusivity, unless that 180-day exclusivity is forfeited.  *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(aa), (bb); 21 U.S.C. § 355(j)(5)(D)(i).

[4] The Court granted Teva's unopposed motion to intervene as a defendant on March 18, 2021.

cause of Teva's failure to timely obtain tentative approval.  As the Administrative Record makes clear, Teva's failure to timely obtain approval is due to:  (1) ███████████████████ ███████████████████████████████████████████████████████ ████████████████████████; and (2) an arbitrary and capricious administrative decision by FDA to tie easily correctible label amendments to ███████████████████ ██████████, thereby allowing Teva unfettered control and apparently unlimited time to amend its label.  Given that there is no evidence in the Administrative Record as to when Teva might ███████████████████████████████████████████████████████ ██████████████, FDA's decision will potentially block generic drug market entry until at least July 23, 2027, including blocking Alvogen's ready and able ANDA product from immediately coming to market.  Indeed, the FDA Teva Decision allows Teva to maintain 180-day marketing exclusivity for a product ██████████████████████ and that was submitted to FDA almost four and a half years ago.  Such a result is not only contrary to the plain statutory language, but it also turns the congressional intent behind the relevant statute on its head.  A statute that was specifically implemented to prevent ANDA applicants like Teva from improperly parking its exclusivity is being used by FDA to deprive patients and payors of a less-expensive generic alternative for years to come.

Second, Teva did not maintain its Paragraph IV certification when it stipulated to an order signed and entered by the U.S. District Court for the District of Delaware that the patents are valid, enforceable, and infringed, even while taking a license to the subject patent.  Indeed, it is illogical that an applicant can maintain a certification that the patents are invalid, not infringed, or unenforceable before FDA (i.e., a Paragraph IV certification) when a court has entered a final, non-appealable order adjudging the opposite.  Moreover, FDA regulations mandate Teva to

amend its Paragraph IV certification under these circumstances.  In fact, FDA's decision here runs contrary to FDA's own statements when promulgating the relevant regulations.

Despite these clear forfeiture events, FDA has rendered a final decision refusing to approve Alvogen's ANDA.  (AR at FDA-000262-63.)  FDA's decision will enable Teva to continue to inappropriately park its exclusivity until 2027 given its patent settlement, contravening the plain statutory directives and congressional intent in adopting the forfeiture provisions in the Medicare Modernization Act of 2003 ("MMA") and depriving patients of access to a less expensive generic alternative to this important medication.  This Court should, therefore, reverse FDA's decision because it is also contrary to a plain reading of the statute and regulations under step one of the *Chevron* analysis.  *Chevron U.S.A. Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842 (1984) (finding that courts should first look to the statute's language to determine if Congress has "directly spoken to the precise question at issue"); *Eagle Pharm., Inc. v. Azar*, 952 F.3d 323, 330-40 (D.C. Cir. 2020) (finding that Congress clearly expressed its intent in the statute at issue and reversing FDA's interpretation under *Chevron* step one); *HealthAlliance Hosps., Inc. v. Azar*, 346 F. Supp. 3d 43, 56 (D.D.C. 2018) (setting aside agency action because "HHS acted in a manner that was contrary to its own regulations").

In this time of great uncertainty when our healthcare system is being pushed to its limits, it is more important than ever that generic products are allowed to enter the market as quickly as possible.  This Court should, therefore, grant Alvogen's combined motion for a preliminary injunction and summary judgment and order FDA to immediately grant final approval to Alvogen's ANDA.

## I.   GENERIC DRUG ENTRY: THE STATUTORY FRAMEWORK

The Federal Food Drug & Cosmetic Act ("FDCA") establishes the requirements for marketing drugs in the United States.  In 1984, Congress amended the FDCA to provide a

streamlined process that manufacturers could use to obtain approval for a generic drug – a drug

which contains the same active ingredient as, and is bioequivalent to, a brand name drug.

Generic drugs are generally sold without a trademark and at significantly lower prices than

branded drugs.  The FDCA amendments, which are codified at 21 U.S.C. § 355 and 35 U.S.C.

§§ 156, 271(e) and 282, are commonly referred to as the "Hatch-Waxman Amendments" or the

"Hatch-Waxman Act."  "A central purpose of the Hatch-Waxman Act . . . is 'to enable

competitors to bring cheaper, generic . . . drugs to market as quickly as possible.'"  *Teva Pharm.*

*USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1334 (Fed. Cir. 2007) (citing 149 Cong.

Rec. S15885 (Nov. 25, 2003)).

## II.   NEW AND ABBREVIATED DRUG APPLICATION REQUIREMENTS

Before marketing a new drug in the United States, the FDCA requires a drug company to

submit a New Drug Application ("NDA") to FDA, and FDA must approve it.  *See* 21 U.S.C.

§ 355(a), (b).  New drugs generally are referred to as "brand name" drugs because they are

marketed under a trademark for the drug product rather than the chemical name for the active

ingredient in the drug product.

The NDA applicant must identify each patent that claims the drug or a method of using

the drug that is the subject of the NDA and that could reasonably be asserted in a patent

infringement action against a person engaged in the unauthorized manufacture, use, or sale of the

drug product.  *See* 21 U.S.C. § 355(b)(1); 21 C.F.R. § 314.53.  Once FDA approves an NDA,

FDA publishes the patent information submitted by the brand name drug company in the Orange

Book.  *See* 21 U.S.C. § 355(b)(1).

Drug companies cannot market generic drugs in the United States until they submit an

ANDA to FDA that FDA approves.  *See* 21 U.S.C. § 355(a), (j).  The ANDA approval process

allows an applicant to rely on the data in an NDA for a brand name drug to show safety and

5

effectiveness, so long as the ANDA drug product is bioequivalent to the branded drug in question, referred to as the Reference Listed Drug ("RLD").

A generic drug company seeking FDA approval for a generic version of a brand name drug product must file, in addition to technical data, one of four certifications with FDA: either (I) that no patent information for the RLD has been filed with FDA; or, for each patent listed in the Orange Book as claiming the RLD or a method of use for which the ANDA applicant is seeking approval, (II) that the patent has expired; (III) that the patent will expire on a particular date (until which time the generic company is not seeking to market its generic product); or (IV) that the patent is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the generic drug for which the ANDA is submitted.  *See* 21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. § 314.94(a)(12)(i)(A)(4)(i).  This last certification is commonly referred to as a "Paragraph IV certification."  *See* 21 C.F.R. § 314.94(a)(12)(i)(A)(4).

If an ANDA applicant makes a Paragraph IV certification, it must provide notice of such certification to the patent owner and the NDA holder.  *See* 21 U.S.C. § 355(j)(2)(B)(iii).  This notice is commonly known as a "Notice Letter."  If suit is brought against the ANDA applicant within 45 days after receipt of the Notice Letter, then final approval of the ANDA is stayed for 30 months from the date of receipt of the Notice Letter.  *See* 21 U.S.C. § 355(j)(5)(B)(iii).

## III.   FIRST APPLICANT STATUS AND 180-DAY EXCLUSIVITY

In order to encourage generic companies to take on the risks and costs of challenging Orange Book patents and thereby bring to consumers the benefit of lower-priced generic drugs as quickly as possible, Congress provided that the first ANDA applicant to file an ANDA with a Paragraph IV certification (the "First Applicant") is given a 180-day period during which it is the only ANDA applicant allowed to market a generic version of the brand name drug.  *See* 21 U.S.C. § 355(j)(5)(B)(iv).  Specifically, Section 355(j)(5)(B)(iv) provides that, if an ANDA with

6

a Paragraph IV certification

> is for a drug for which a first applicant has submitted an
> application containing [a Paragraph IV] certification, the
> application [of the later applicant] shall be made effective on the
> date that is 180 days after the date of the first commercial
> marketing of the drug . . . by any first applicant.

## IV.    FORFEITURE OF 180-DAY EXCLUSIVITY

Under the provisions of the FDCA in effect before 2003, the 180-day period of marketing

exclusivity did not begin to run until the earlier of (1) the first commercial marketing of the

ANDA product or (2) a court decision finding the relevant patents invalid or not infringed.  *See*

21 U.S.C. § 355(j)(5)(B)(iv) (2003).  Under that statutory structure, the Federal Trade

Commission ("FTC") found that First Applicants would sometimes enter into settlement

agreements by which they agreed to not begin commercial marketing for long periods of time.

*See Legislative and Regulatory Responses to the FTC Study on Barriers to Entry in the*

*Pharmaceutical Marketplace: Hearing Before the S. Comm. on the Judiciary*, 108th Cong. 250

(2003) (Submission for the Record, prepared statement of Federal Trade Comm'n), at 34.[5]  The

FTC began to investigate and challenge certain agreements, finding that they were sometimes

being used to "impede entry by other generic competitors."  *Id.*  Partly in response to the FTC's

conclusions that certain settlement agreements were acting as a "bottleneck" and were unduly

delaying generic competition and negatively impacting the public's interest in obtaining less

expensive drugs, Congress amended the FDCA in 2003 by enacting the MMA.  *See* PL 108–173,

Dec. 8, 2003, 117 Stat 2066.

The MMA sets forth provisions by which a First Applicant can forfeit its exclusivity.  *See*

---

[5] *Available at* https://www.govinfo.gov/content/pkg/CHRG-108shrg91212/pdf/CHRG-108shrg91212.pdf (last visited April 1, 2021).

21 U.S.C. § 355(j)(5)(D)(i)(I)–(VI).  These forfeiture provisions "attempt[] to safeguard against the possibility that first generic applicants will delay the start of commercial marketing" and "intend[] to prevent parking of the exclusivity . . . by providing for several situations in which a generic company with the exclusivity forfeits the exclusivity, clearing the way for other generic companies to bring their products to market."  *See Examining the Senate and House Versions of the "Greater Access to Affordable Pharmaceuticals Act": Hearing before the S. Comm. on the Judiciary*, 108th Cong. 390 (2003) (prepared statement of Timothy J. Muris, Chairman, Federal Trade Comm'n);[6] 149 Cong. Rec. S15884 (daily ed. Nov. 25, 2003) (statement of Sen. Kennedy).  "The forfeiture triggers were written into the statute to prevent first applicants from 'parking' their rights by failing to act on their applications, either due to a monetary 'pay-to-delay' settlement or for other reasons."  *Ranbaxy Labs., Ltd v. Burwell*, 82 F. Supp. 3d 159, 197 (D.D.C. 2015); *see also* GENERIC DRUG ENTRY PRIOR TO PATENT EXPIRATION: AN FTC STUDY, 2002 WL 1775284, at *48 (July 1, 2002) (stating that data showed that before the MMA, 14 out of 20 settlement agreements between generic drug manufactures and NDA holders "had the potential, at the time they were executed, to 'park' the first generic applicant's 180-day exclusivity for some period of time, thus preventing FDA approval of any eligible subsequent applicants").  As noted by this Court, "Congress enacted the forfeiture provisions to 'ensure that the 180-day exclusivity period enjoyed by the first generic to challenge a patent cannot be used as a bottleneck to prevent additional generic competition.'"  *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 4 (D.D.C. 2008) (citing 149 Cong. Rec. S15746 (daily ed. Nov. 24, 2003) (statement of Sen. Schumer)).  And in 2011, several Senators who were in Congress at the time

---

[6] *Available at* https://www.judiciary.senate.gov/imo/media/doc/muris_testimony_08_01_03.pdf (last visited April 1, 2021).

of enactment of the MMA noted to the then FDA Commissioner that the forfeiture provisions of the MMA were enacted "[s]pecifically [to] change[] [the FDCA] to a 'use it or lose it' system that prevents a [First Applicant's] exclusivity from being indefinitely 'parked' and creating a bottleneck to generic competition."[7]

Under one of the MMA's forfeiture provisions, forfeiture can occur if the "[t]he first applicant fails to obtain tentative approval of [its ANDA] within 30 months after the date on which the application is filed." *See* 21 U.S.C. § 355(j)(5)(D)(i)(IV).  The only exception to this provision is if "the failure [to obtain tentative approval] is *caused by* a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed." *Id.* (emphasis added).  Forfeiture can also occur if the First Applicant withdraws its Paragraph IV certification or amends it to one of the other types of certifications.  *See* 21 U.S.C. § 355(j)(5)(D)(i)(III).  Separate from the forfeiture provisions related to withdrawal or amendment of a Paragraph IV certification, a First Applicant must also lawfully maintain its Paragraph IV certification to remain entitled to 180-day marketing exclusivity.  *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb).

## STATEMENT OF FACTS[8]

### I.    TEVA'S FIRST-FILED ANDA

BioDelivery Sciences International, Inc. ("BDSI") is the holder of NDA No. 207932, under which it markets buprenorphine hydrochloride buccal film ("Buprenorphine Film") in

---

[7] *Letter to Margaret Hamburg, Commission of the Food and Drug Administration*, from Sens. Harkin, Rockefeller, Schumer, Stabenow, and Brown, dated Mar. 10, 2011 *available at* https://web.archive.org/web/20140912072147/http://www.harkin.senate.gov/press/release.cfm?i=331827 (last visited April 1, 2021).

[8] Judicial review in this case is based solely on the Administrative Record.  *See* LCvR 7(h)(2).

various dosage strengths under the brand name BELBUCA.  *See* Declaration of Tunie Zaku

("Zaku Decl.") ¶ 6.  Buprenorphine Film is prescribed for the management of pain severe enough

to require daily, around-the-clock, long-term opioid treatment and for which alternative

treatment options are inadequate.  *Id.* ¶ 6.  In 2020, physicians wrote over 431,000 total

prescriptions for BELBUCA that resulted in $136,128,000 in net sales for BDSI.  *Id.* ¶ 6; *see*

*also* Exhibit A at 7, F-26.  Buprenorphine is a Schedule III opioid,[9] having less abuse and

addiction potential compared to Schedule II opioids, such as oxycodone, fentanyl, hydrocodone,

and morphine.  *See* 21 U.S.C. § 812(b)(3) (stating that a Schedule III drug "has a potential for

abuse less than the drugs or other substances in schedules I and II" and "[a]buse of the drug or

other substance may lead to moderate or low physical dependence or high psychological

dependence"); 21 U.S.C. § 812(b)(2) (stating that a Schedule II drug "has a high potential for

abuse" and "[a]buse of the drug or other substances may lead to severe psychological or physical

dependence").

### A.      The Filing of Teva's ANDAs and Related Litigation

Teva is the First Applicant for ANDAs referencing BELBUCA, being the first to

purportedly submit substantially complete ANDAs with Paragraph IV Certifications for two of

the patents listed in the Orange Book for BELBUCA at the time of Teva's ANDA submissions

(U.S. Patent Nos. 7,579,019 ("the '019 patent") and 8,147,866 ("the '866 patent")).  (AR at FDA-

000003.)  Teva's ANDAs were submitted as follows:

1. ANDA No. 209704, submitted on September 12, 2016, for Buprenorphine Film, 900 mcg;

2. ANDA No. 209772, submitted on October 4, 2016, for Buprenorphine Film,

---

[9] *See* DEA Controlled Substances listing, *available at* https://www.deadiversion.usdoj.gov/
schedules/orangebook/c_cs_alpha.pdf, at 6 (last visited April 1, 2021).

300 mcg, 450 mcg, 600 mcg, and 750 mcg; and

3. ANDA No. 209807, submitted on October 24, 2016, for Buprenorphine Film, 75 mcg and 150 mcg.

(*Id.*)  The expiration of the 30-month period from those submission dates occurred on March 12, 2019, April 4, 2019, and April 24, 2019, respectively.  (*See* AR at FDA-000006.)  Teva's ANDA applications have now been pending at FDA for almost four and a half years.

BDSI brought suit against Teva, asserting infringement of the '019 and '866 patents based on Teva's ANDA submissions.  Complaint, *BDSI/Teva*, No. 16-1303 (D. Del. Dec. 22, 2016), ECF. No. 1; Complaint, *BDSI/Teva*, No. 17-118 (D. Del. Feb. 3, 2017), ECF No. 1 (collectively, "the *BDSI/Teva* cases").  On February 7, 2018, as a result of a settlement between BDSI and Teva, the court overseeing the litigation between Teva and BDSI entered a Stipulation and Order of Dismissal that stated, among other things, that Teva "acknowledge[s] and agree[s] that the ['019 and '866 patents] are valid, enforceable, and infringed with respect to [Teva's ANDAs]."  (AR at FDA-000290-95.)  The court further ordered that "[a]ll claims and defenses . . . are hereby dismissed, with prejudice" and that the "Stipulation [a]nd Order shall finally resolve this Action between Plaintiffs and Defendants."  (*See, e.g.*, AR at FDA-000291-92.)  The court also enjoined Teva from marketing its ANDA products before expiration of the '866 patent (which will not occur until July 23, 2027), "except as provided in the parties' settlement agreement."[10]  (*See, e.g.*, AR at FDA-000291, FDA-000296.)  The court also ordered that the parties "expressly waive[d] any right to appeal or otherwise move for relief from" the court's

---

[10] As recognized in the FDA Response Memo, the '019 patent expired on January 22, 2020 and thus can no longer serve as a basis for exclusivity.  (AR at FDA-000011, n.2; *see also* 21 U.S.C. § 355(j)(5)(D)(i)(VI).)  Although U.S. Patent No. 6,159,498 ("the '498 patent") was also listed in the Orange Book at the time Teva filed its ANDAs, it expired on October 18, 2016. ■■■■

order.  (*See, e.g.*, *id.*)

As part of Teva's settlement with BDSI, Teva obtained a non-exclusive license to the '866 patent that allows Teva to begin marketing its ANDA products six months prior to the expiration of the '866 patent on January 23, 2027 (or earlier under certain circumstances).  (AR at FDA-000011-12.)

### B.     The Administrative History of Teva's ANDA and the FDA Teva Decision

On December 16, 2016, after Teva filed each of its ANDAs, FDA approved "safety labeling changes" for BELBUCA.  (AR at FDA-000007.)  FDA issued Information Requests for each of Teva's ANDAs on March 16, 2017 (ANDA Nos. 209704 and 209772) and April 21, 2017 (ANDA No. 209807), with which FDA required Teva to amend its label to match the newly-approved label for BELBUCA.[11]  (AR at FDA-000030-32, FDA-000081-83, FDA-000134-36.)  FDA stated that the required changes "represent *EASILY CORRECTABLE DEFICIENCIES*" and that Teva "should provide a complete response to these deficiencies within ten (10) U.S. business days."  (*See, e.g.*, AR at FDA-000030.)  The Information Requests also stated that if Teva did not submit a "complete response within ten (10) U.S. business days, . . . the listed deficiencies will ███████████████████████████████████."  (*See, e.g.*, *id.*)  On May 4, 2017 (within 10 business days), Teva responded with an amendment updating the labeling for only one ANDA (ANDA No. 209807).  (AR at FDA-000007.)

FDA then issued ███████████████████████████████████████████ ██████████████████████████████████████████████████████████ According to the FDA Teva Decision, ███████████████████████████████ ███████████████████████████████████████████████ For example, FDA's

---

[11] *See* 21 U.S.C. § 355(j)(2)(A)(v) ("the labeling proposed for the new [ANDA] drug is the same as the labeling approved for the listed drug" except for certain, specified changes").



 For each of Teva's ANDAs, for example,

FDA

therefore determined that

A bioequivalence study is a "requirement imposed by FDA for in vitro and/or in vivo testing of specified drug products that must be satisfied as a condition of marketing," and these studies are central to the Hatch-Waxman regime. *See* 21 C.F.R. § 314.3(b) ("bioequivalence requirement"). Further,

Moreover,



Teva provided

Shortly thereafter, FDA



For the first time, Teva

Teva also stated that

Nowhere did Teva mention the labeling changes

FDA, again,

On September 18, 2018,

FDA approved additional labeling changes for BELBUCA.  (AR at FDA-000007.)  Although FDA

On January 28, 2021 (two days before the expiration of the 30-month stay of approval of Alvogen's ANDAs), FDA finalized the FDA Teva Decision, in which it determined that Teva did not forfeit any right to 180-day marketing exclusivity for failing to obtain tentative approval within 30 months of filing of its ANDAs.  (AR at FDA-000001-09.)  FDA decided that the December 2016 and September 2018 amendments to the BELBUCA label constituted "a change in the requirements for approval" for Teva's ANDAs.  (AR at FDA-000007-08.)  FDA stated:

On their respective forfeiture dates, ANDAs 209704 and 209772 each had labeling deficiencies related to the December 2016 changes in the RLD labeling as set forth in ███████. Additionally, on their respective forfeiture dates, all three ANDAs were deficient with respect to the September 2018 changes in the RLD labeling. Although these changes in the RLD labeling postdated ███████, the changes necessitated conforming changes in each of the ANDAs' labeling, and ███████ for each of the three ANDAs had instructed Teva to make such necessary revisions in ███████ ████████████.

\*       \*       \*

Under the circumstances here, and given that there was a change in the requirements for approval with respect to labeling coupled with FDA's instructions ██████████████████████, we conclude that a change in the requirements for approval with respect to labeling was a cause of Teva's failure to obtain tentative approval by the forfeiture dates of March 12, 2019 for ANDA 209704, April 4, 2019 for ANDA 209772, and April 24, 2019 for ANDA 209807.

(*Id.*)

## II.   ALVOGEN'S ANDA AND FDA'S REFUSAL TO GRANT IT FINAL APPROVAL

Alvogen submitted its ANDA for Buprenorphine Film, 75 mcg, 150 mcg, 300 mcg, 450 mcg, 600 mcg, and 750 mcg, and 900 mcg on May 23, 2018.  (AR at FDA-000297.) Alvogen's ANDA contained Paragraph IV certifications against the '866 patent and U.S. Patent Nos. 9,655,843 ("the '843 patent") and 9,901,539 ("the '539 patent"), both of which had been listed in the Orange Book for BELBUCA after Teva filed its ANDAs.  (AR at FDA-000257; AR at FDA-000266.)  On July 27, 2018, Alvogen provided notice of its Paragraph IV certifications to BDSI, and BDSI brought a patent infringement suit within 45 days of receipt of Alvogen's notice, resulting in a 30-month stay on final approval of Alvogen's ANDA.  (AR at FDA-000264.)

### A.   Alvogen's Requests for Final Approval of Its ANDAs

In a letter dated June 12, 2019 – less than thirteen months after Alvogen submitted its

ANDA to FDA – FDA granted tentative approval to Alvogen's ANDA, concluding "that adequate information has been presented to demonstrate that the drug is safe and effective for use as recommended in the submitted labeling."  (AR at FDA-000297-302.)  FDA also stated, however, that final approval could not be granted until one of three events occurred: (a) expiration of the 30-month stay on final approval of Alvogen's ANDA; (b) the date on which a court decides that the '866, '843, and '539 patents are invalid or not infringed; or (c) expiration of the '866, '843, and '539 patents.  (AR at FDA-000298.)

The 30-month stay on final approval of Alvogen's ANDA expired on January 30, 2021. (AR at FDA-000264.)  Alvogen, therefore, requested final approval from FDA for January 30, 2021.  (AR at FDA-000262.)  Alvogen expected no issues receiving the requested final approval because publicly available information indicated that Teva had forfeited any exclusivity arising from its status as the First Applicant.  (AR at FDA-000262-63.)

Yet, in response to Alvogen's request, FDA sent another tentative approval letter, citing "exclusivity issue[s]" associated with a First Applicant, i.e., Teva, as a reason for maintaining tentative approval and denying grant of final approval to Alvogen's ANDA.  (AR at FDA-000257.)  To date, Alvogen has not received final approval, depriving it of access to the market and patients from accessing a less expensive generic product.

### B.      The FDA Response Memo

On February 10, 2021, in response to receipt of the second tentative approval letter, counsel for Alvogen wrote to FDA, stating that Alvogen believed that its ANDA should have been granted final approval because Teva (1) failed to timely obtain tentative approval and (2) failed to maintain its Paragraph IV certification due to the Stipulation and Order of Dismissal entered by the court in the *BDSI/Teva* litigation.  (AR at FDA-000262-68.)

The FDA Response Memo was apparently drafted in response to this letter on March

10, 2021.  (AR at FDA-000010-12.)  In the FDA Response Memo, FDA reaffirmed its position

in the FDA Teva Decision, stating that it was FDA's position that Teva did not forfeit any right

to 180-day marketing exclusivity.  (AR at FDA-000011-12.)  According to FDA, Teva also

maintained its Paragraph IV certification under 21 C.F.R. § 314.94(a)(12)(v) because the license

it obtained for the '866 patent allows Teva to begin marketing six months before the patent's

expiration:

> [T]o give meaning to a license permitting marketing before the
> patent expires, the ANDA applicant must be able to maintain a
> paragraph IV certification; requiring the applicant to change to a
> paragraph III certification (which would indicate that the applicant
> does not intend to seek approval of its ANDA until after the patent
> expires) would make it impossible for the ANDA applicant to
> obtain approval of its product before the patent expires, thus
> rendering the license meaningless.  Accordingly, a paragraph IV
> certification is appropriate because Teva has a basis to assert that
> its manufacturing, use, or sale of the drug, as allowed by the
> license prior to expiration of the patent, will not infringe the '866
> patent.

(AR at FDA-000012.)

## ARGUMENT

### I.  LEGAL STANDARDS

In deciding whether to grant a motion for a preliminary injunction when consolidated

with a decision on the merits under Rule 65(a)(2), the Court "need not consider the non-merits

elements of a motion for injunctive relief—*i.e.*, irreparable harm, the balance of equities, and the

public interest." *Dongkuk Int'l, Inc. v. U.S. Dep't of Justice*, 204 F. Supp. 3d 18, 21 (D.D.C.

2016).  "The fact that the proceedings have been consolidated," however, "should cause no delay

in the disposition of the application for the preliminary injunction." *See* FED. R. CIV. P. 65(a)(2)

Advisory Committee's note (1966).  As discussed in Section IV, *infra*, every day that FDA's

improper delay of Alvogen's final approval remains is costing Alvogen its first mover advantage

into the Buprenorphine Film market and is continuing to deprive patients and payors with a less expensive generic alternative.  The swift adjudication of Alvogen's claims is therefore proper.

The Administrative Procedure Act ("APA") provides this Court the authority to review and overturn as unlawful FDA's determination denying Alvogen's ANDA final approval.  Under the APA's standard of review, the Court should reverse FDA's decision and order FDA to immediately grant final approval to Alvogen's ANDA.

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  When reviewing an agency's decision under the APA, a court is directed to:

> decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be -
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> >
> > * * *
> >
> > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

5 U.S.C. § 706.

Moreover, the "'entire case' on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001) (citations omitted).  "[I]t is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of

law the evidence in the administrative record permitted the agency to make the decision it did.'"

*Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (citations

omitted).  "Summary judgment thus serves as the mechanism for deciding, as a matter of law,

whether the agency action is supported by the administrative record and otherwise consistent

with the APA standard of review."  *Id.*

## II.   THE COURT CAN AND SHOULD REVIEW FDA'S DETERMINATION.

The APA provides for review of "final agency action for which there is no other adequate

remedy in a court."  5 U.S.C. § 704.  FDA's decision here regarding exclusivity is a final agency

action that is the sole, direct cause of FDA's refusal to approve Alvogen's ANDA.  *See* 21

U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA) (defining tentative approval); *see also* 21 C.F.R.

§ 314.3(b).

On February 4, 2021, FDA confirmed that Alvogen's ANDA is in position for full

approval (tentatively approved) and that FDA was delaying final approval on the basis of 180

days of marketing exclusivity that FDA had improperly granted to Teva.  FDA cannot dispute

that its action is final.

Moreover, this issue is ripe for review.  An agency determination is ripe if it is fit for

judicial review and substantial hardship will result if such review is postponed.  *Nat'l Ass'n of

Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 463-64 (D.C. Cir. 2006).  Both

elements are satisfied here.  First, the facts forming the basis for FDA denying final approval to

Alvogen's ANDA are already established.  No further factual development is needed for this

Court to assess the merits of Alvogen's arguments in its challenge to FDA's determination that

its ANDA cannot be approved until 180 days after Teva begins commercial marketing.  *See, e.g.*,

*Reckitt Benckiser Inc. v. EPA*, 613 F.3d 1131, 1137-38 (D.C. Cir. 2010) (issue was ripe where

EPA informed the plaintiff that its products "would be considered misbranded" after a specific

date, determination was based on legal issues, and no further facts would be needed to review

decision); *Teva Pharm. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1308-09 (D.C. Cir. 2010) (issue

was ripe where it was "undoubtedly 'purely legal,'" there were no factual disputes, and "a near-

certain loss of [a] first-mover advantage" demonstrated harm).

Second, Alvogen is already suffering and will continue to suffer substantial and

irreparable harm if FDA does not grant its ANDA final approval.  Absent Court action ordering

FDA to approve Alvogen's ANDA, Alvogen cannot launch its generic Buprenorphine Film

products until 180 days after Teva begins commercial marketing – which currently cannot occur

until July 2027 (*see* AR at FDA-000012)) – or until Alvogen obtains a final decision from which

no appeal can be taken finding that the '866 patent is invalid or not infringed (*see* 21 U.S.C.

§ 355(j)(5)(D)(i)(I)(bb)(AA)) – which may not occur for about two years.  Alvogen is the only

ANDA filer with tentative approval and thus is the only company that can immediately market a

generic Buprenorphine Film product after FDA's wrongful decision preserving Teva's

exclusivity is reversed.  Every day that FDA's improper delay of Alvogen's final approval

remains is costing Alvogen its first mover advantage into this market.  *See* Zaku Decl. ¶ 13;

*TorPharm, Inc. v. Shalala*, No. 97-1925, 1997 WL 33472411, at *4 (D.D.C. Sep. 15, 1997)

(plaintiff would "be permanently disadvantaged in the market" because "timely entry into the

market is critical for success").  This includes the opportunity to establish unique and lasting

customer relationships, to enhance its reputation, and to gain significant and enduring market

share and revenue.  *See* Zaku Decl. ¶ 13.  These losses are neither easily measurable nor

compensable through money damages.  Without Court action, Alvogen will be denied this

advantage and be substantially and irreparably harmed.

III.    **FDA'S DECISION TO DENY FINAL APPROVAL**
       **TO ALVOGEN'S ANDA IS CONTRARY TO LAW.**

The plain language of the FDCA and FDA's regulations make clear that FDA's decision

to deny final approval to Alvogen's ANDA is unlawful.  First, allowing Teva to maintain any

right to 180-day marketing exclusivity when it has had close to four and a half years to put its

ANDA in condition for approval frustrates the purpose behind the MMA's forfeiture provisions.

Congress enacted those provisions to prevent First Applicants, like Teva, from unduly

postponing market entry and blocking later applicants, like Alvogen, from bringing their

products to market.  Indeed, as members of Congress previously stated to FDA, the forfeiture

provisions implemented a "'use it or lose it' system" to incentivize First Applicants to promptly

make use of any entitlement to 180-day marketing exclusivity or lose that entitlement.[14]  As

such, FDA's decision here frustrates the intent of Congress to quickly bring lower-cost generic

drugs to market.  Second, in light of the court's entry of an order in the *BDSI/Teva* cases in

which the '866 patent was found to be valid, enforceable, and infringed, Teva should no longer

be considered the First Applicant given its failure to maintain its challenge to the patents (and

thus failure to maintain is Paragraph IV certification).  Teva should also be deemed to have

forfeited the 180-day exclusivity period because it was required by FDA regulation to amend its

Paragraph IV certification, and Teva's taking of a license to the '866 patent does not negate the

clear mandate of FDA's regulation.

Granting Alvogen's motion will further the public interest by allowing vigorous generic

competition with the brand product that will lower prices and increase access for patients and

payors.  Congress designed the forfeiture provisions of the MMA amendments to prevent the

"parking" of exclusivity that could "be used as a bottleneck to prevent additional generic

---

[14] *See* note 6, *supra*.

competition." *Hi-Tech*, 587 F. Supp. 2d at 4.  Removing the bottleneck improperly imposed by

FDA will also ensure that patients can have expanded access to an opioid that has less abuse and

addiction potential compared to other opioids, such as oxycodone, fentanyl, hydrocodone, and

morphine, which is especially beneficial in light of the ongoing opioid epidemic in the United

States.  *See* 21 U.S.C. § 812(b)(2), (3).  Further, ensuring that FDA treats all ANDA applicants

the same and interprets the FDCA properly also promotes the public interest.  *See Bracco*

*Diagnostics*, 963 F. Supp. at 30 ("[r]equiring [FDA] to act lawfully is also very much in the

public interest."); *Whitaker v. Thompson*, 248 F. Supp. 2d 1, 16 (D.D.C. 2022) ("[I]t is clearly in

the public interest to ensure that governmental agencies, such as the FDA, fully comply with the

law.").  It is therefore necessary and appropriate for this Court to reverse FDA's decision here

and order FDA to grant final approval to Alvogen's ANDA.

> **A.      Teva Failed to Obtain Tentative Approval of Its**
> **          ANDAs Within 30 Months, and Teva's Failure Was Not**
> **          Caused by FDA's Identified Change in Approval Requirements.**

Although FDA decided that Alvogen is ineligible for final approval because of Teva's

180-day exclusivity period, any such period has long been forfeited.  Specifically, Teva

undisputedly failed to obtain *any* approval (tentative or final) of its ANDAs within 30 months

after their filing.  (AR at FDA-000001-09.)  And importantly, as discussed herein, Teva's failure

to obtain timely approval was not "caused by" the December 2016 or September 2018 label

changes for BELBUCA that Teva needed to address.  *See* 21 U.S.C. § 355(j)(5)(D)(i)(IV).

FDA's decision to delay the approval of Alvogen's ANDA is contrary to a plain reading of the

statute and should thus be reversed by this Court.  *Chevron*, 467 U.S. at 842.

> **1.      Teva Undisputedly Missed the**
> **         30-Month Deadline to Obtain Tentative Approval.**

As discussed above, Teva's first ANDA, with a Paragraph IV certification for the

900 mcg dose, was submitted in September 2016; its second and third ANDAs, with Paragraph

IV certifications for the 75 mcg, 150 mcg, 300 mcg, 450 mcg, 600 mcg, and 750 mcg doses,

were submitted in October 2016.  (AR at FDA-000003.)  Thirty months from these submission

dates is March 2019 and April 2019, respectively.  The 30-month deadline for each of these

submissions occurred nearly two years ago, yet Teva still does not have approval (final or

tentative).  Therefore, under Section 355(j)(5)(D)(i)(IV), Teva's failure to obtain timely tentative

approval mandates forfeiture of its 180-day exclusivity under the clear statutory directive.

**2.      Teva's Failure to Obtain Tentative Approval Was
Not Caused by the Change in BELBUCA Labeling.**

To avoid forfeiture resulting from not obtaining timely tentative approval, the FDCA

unambiguously requires that the failure be "caused by a change in or a review of the

requirements for approval of the application imposed after the date on which the application is

filed."  *See* 21 U.S.C. § 355(j)(5)(D)(i)(IV).[15]  As FDA has recognized, the exclusivity period

will be preserved only if the First Applicant failed to obtain tentative approval within 30 months

and the "evidence demonstrates that there was a change in, or a review of, the requirements for

approval and that the applicant was *actively addressing issues related to the change in*, or review

of, approval requirements . . . *and these efforts precluded tentative approval or final approval at*

*that time*."  *Guidance for the Industry, 180-Day Exclusivity: Questions and Answers, Draft*

*Guidance* ("180-Day Exclusivity Q&A Guidance") (Jan. 2017) at 22 (emphasis added).[16]  This

exception clearly does not apply here.

---

[15] FDA can also extend the 30-month period to obtain tentative approval due to the submission of a citizen petition.  *See* 21 U.S.C. § 355(q)(1)(G).  No citizen petitions, however, have been filed for Buprenorphine Film.  (AR at FDA-000006.)

[16] *Available at* https://www.fda.gov/media/102650/download (last visited April 1, 2021).

According to FDA, the December 2016 and September 2018 changes to the BELBUCA label constituted a change in the approval requirements for Teva's ANDAs.  (AR at FDA-00007-08.)  But, the Administrative Record makes clear that Teva's failure to obtain timely tentative approval was caused by ███████████████████████████████████████ ████████, not by any labeling change requirement.  It is undeniable that, even if Teva had promptly amended its proposed label to coincide with the changes in the BELBUCA label, Teva still would not have timely obtained tentative approval given that it ███████████████ ██████████████████████████████████████.

As discussed above, FDA issued Information Requests for each of Teva's ANDAs on March 16, 2017 (ANDA Nos. 209704 and 209772) and April 21, 2017 (ANDA No. 209807). (AR at FDA-000030-32, FDA-000081-83, FDA-000134-36.)  Those Information Requests required Teva to amend its label to match the December 2016 changes to the label for BELBUCA.  (*See, e.g.*, AR at FDA-000030-32.)  FDA characterized this requirement as "*EASILY CORRECTABLE DEFICIENCIES*" and indicated that Teva should provide a response within ten business days ████████████████████████████████████████ ████████████  (AR at FDA-000030.)  For ANDA No. 209807, Teva *did* submit the requested updates to the label within ten business days, on May 4, 2017 (AR at FDA-000137-38), demonstrating how quickly and easily the requested label changes can be made.[17]  Indeed, an

---

[17] *Compare* Manual of Policies & Procedures, Office of New Drugs, Food & Drug Admin., 6004.3 (July 10, 2019) (requiring response from NDA-holder within 30 calendar days for safety labeling changes required under Section 505(o)(4) of the FD&C Act), *with* AR at FDA-000030 (requiring Teva ██████████████████████ within ten (10) U.S. business days" for its "easily correctable" labeling deficiency), FDA-000081 (same), FDA-000134 (same).  Given that an NDA-holder has 30 days to develop and implement substantive labeling changes, ten days is more than enough time for an ANDA filer to copy and paste any labeling updates from the RLD's labeling.

ANDA filer is required to use the identical label as the branded reference drug, and only certain, limited changes (not applicable here) are permitted.  *See* 21 U.S.C. § 355(j)(2)(A)(v).



███████████████████████████████████████████████████████

██████████████ that caused the delays, not the perfunctory labeling change.  (AR at FDA-000005

n.4.)

As FDA has recognized, the statute requires that the 30-month tentative approval

requirement may be tolled only if there is a showing that:  "(1) FDA changed . . . the

requirements for approval while the application was under review *and* (2) this change in, or

review of, approval requirements *was a cause of the failure to obtain tentative approval* or final

approval by the 30-month forfeiture date."  *See* 180-Day Exclusivity Q&A Guidance at 22

(emphasis added); *see also* 21 U.S.C. § 355(j)(5)(D)(i)(IV) (stating that forfeiture for failure to

obtain tentative approval within 30 months of ANDA submission is excused if that failure was

"*caused by* a change in or a review of the requirements for approval" (emphasis added)); *Amneal*

*Pharm. LLC v. FDA*, 285 F. Supp. 3d 328 (D.D.C. 2018) (finding that FDA acted within its

authority when it determined that the first applicant forfeited its 180-day exclusivity period by

failing to obtain tentative approval within 30 months and any delays were not caused by a change

in "requirements for approval").  But, FDA can make no such showing here because the

requirement for Teva to amend its labels was not what caused the delay in the approval of its

ANDAs.[19]  Indeed, it is inconceivable that a simple fix that can be addressed in hours or days

---

[19] FDA's 180-Day Exclusivity Q&A Guidance further requires that, "[w]hen the evidence fails to
demonstrate that the sponsor was actively addressing the change in . . . approval requirements,
. . . FDA generally does not presume that the failure was caused by a change in or review of
approval requirements."  180-Day Exclusivity Q&A Guidance at 22.  As demonstrated by the
Administrative Record, Teva ██████████████████████████████████████, yet
never once mentioned that the time was needed to actively address the labeling change.  (AR at
FDA-FDA-000048-49, FDA-000053-56, FDA-000057-58, FDA-000100-101, FDA-000105-108,
FDA-000112-13, FDA-000153-54, FDA-000158-61, FDA-000162-63.)  The reason is obvious –
it would take very little time to amend the label.

can be used to forgive a multi-year delay in approval due to the applicant's own inaction on unrelated deficiencies in the ANDA.

### 3. FDA's Decision Allowing Teva Unlimited Time to Obtain Tentative Approval is Arbitrary and Capricious.

It was arbitrary and capricious for FDA to give Teva *carte blanche* to address minor label changes whenever it chooses to do so and then allow it to bootstrap those label changes with ███ ████████████ Teva's ANDAs.  In so doing, FDA allowed Teva to do an end-run around the statutory forfeiture provision.  This creates an absurd result that allows Teva to (1) avoid losing its entitlement to 180-day marketing exclusivity ██████████████████████████ ████████ from the minor labeling change, which for at least one ANDA it addressed within ten business days and (2) park its exclusivity for years on end and until at least 2027.

But, "FDA must interpret the statute to avoid absurd results and further congressional intent."  *Teva Pharm., USA, Inc. v. FDA*, 182 F.3d 1003, 1011 (D.C. Cir. 1999).  Indeed, had the BELBUCA label changes not occurred, FDA would clearly have found Teva to have forfeited under the facts here.[20]  Teva's ANDAs were ████████████████████████████ ██████████████████████████████████████████████████████████████████ ███████████████████████ well past the 30-month date to obtain tentative approval.  In fact, there is no evidence whatsoever in the Administrative Record as to when Teva might ████████████████████████████████████████████████████, potentially blocking generic drug market entry until the '866 patent expires on July 23, 2027.  FDA's decision to maintain Teva's exclusivity is contrary to congressional intent of the MMA, given

---

[20] Further, upholding Teva's exclusivity would invite brand companies to make labeling changes during the life of a pending ANDA as an abuse tactic, which could result in non-forfeiture and a bottleneck in market access, all the while allowing the brand company to maintain its market control.  *See, e.g.*, *Hi-Tech*, 587 F. Supp. 2d at 4.

that "Congress enacted the forfeiture provisions to 'ensure that the 180-day exclusivity period enjoyed by the first generic to challenge a patent cannot be used as a bottleneck to prevent additional generic competition.'"  *Hi-Tech*, 587 F. Supp. 2d at 4 (citing 149 Cong. Rec. S15746 (daily ed. Nov. 24, 2003) (statement of Sen. Schumer)).

### 4.    FDA's Decision Allowing Teva to Park its Exclusivity Subverts Congressional Intent and Should Be Reversed under *Chevron*.

By allowing Teva to maintain its exclusivity – in contravention of the plain language of the statute – FDA has effectively permitted Teva to park its exclusivity, potentially indefinitely. This blocks a ready and able ANDA filer, currently undertaking great expense and effort in patent litigation, from obtaining final approval.  Thus, FDA is depriving the public of the benefit of a generic drug product, in contravention of the plain statutory language and Congress's intent behind the MMA amendments to the Hatch-Waxman Act.  It is axiomatic that FDA must give effect to the intent of Congress as expressed in the plain meaning of the FDCA.  *See Chevron*, 467 U.S. at 842; *see also STI Pharma, LLC v. Azar*, No. 18-1231, 2020 WL 1332004, at *13 (D.D.C. Mar. 23, 2020) (setting aside CMS's decision because, when "the traditional tools of statutory interpretation—including the plain meaning of the text and the purpose of the statute— reveal a 'single right answer' to the meaning of the statute, that ends the matter" (citation omitted)); *Amarin Pharm. Ir. Ltd. v. FDA*, 106 F. Supp. 3d 196, 208-09 (D.D.C. 2015) (vacating FDA's decision because "the statute's text, structure, and purpose do not 'encompass' or 'permi[t]' the construction the Agency has given it").  And under *Chevron*, FDA's decision finding that Teva did not forfeit any entitlement to 180-day marketing exclusivity must be reversed.

The *Chevron* step one analysis is focused, first and foremost, on the text of the statute. "If the statute's meaning is unambiguous, then [this Court] need go no further."  *Eagle*, 952 F.3d

at 330.  In interpreting the statute, the court should "presume that the legislature says in a statute

what it means and means in a statute what it says there."  *Id.* (quotations omitted).  Here, the

FDCA unambiguously states that a First Applicant forfeits its 180-day exclusivity unless the

delay is "caused by a change in . . . the requirements for approval."  *See* 21 U.S.C.

§ 355(j)(5)(D)(i)(IV).  There is no daylight in the statue for FDA to inject its own interpretation.

And plainly, the requirement for Teva to address the changes to the BELBUCA label were not

the "cause" of Teva's failure to timely obtain tentative approval, as discussed above.  The

Court's inquiry under *Chevron* can and should end there.  *Eagle*, 952 F.3d at 330.

Notwithstanding the foregoing *Chevron* step one analysis, the FDA Teva Decision

seemingly takes the position that the FDCA's forfeiture provision for failure to timely obtain

tentative approval allows Teva to indefinitely avoid addressing the identified change in approval

requirements.  But even under *Chevron* step two, FDA is entitled to no deference for such an

interpretation because it would be "arbitrary, capricious, or manifestly contrary to the statute."

*Chevron*, 467 U.S. at 844.

Under *Chevron* step two, the court should defer to an agency's interpretation of a statute

only if it is "based on a permissible construction of the statute."  *Id.* at 843.  Here, allowing a

First Applicant to tie a purported change in the requirements for approval with ████████████

████████ (the actual cause of its failure to obtain approval) and thus perpetually park its

exclusivity runs contrary to the whole purpose of the MMA's forfeiture provisions.  Indeed, as

discussed above, "[t]he forfeiture triggers were written into the statute to prevent first applicants

from 'parking' their rights *by failing to act on their applications*, either due to a monetary 'pay-

to-delay' settlement *or for other reasons*."  *Ranbaxy Labs.*, 82 F. Supp. 3d at 197 (emphasis

added).  And the MMA amendments were enacted "[s]pecifically [to] change[] [the FDCA] to a

'use it or lose it' system that prevents a [First Applicant's] exclusivity from being indefinitely 'parked' and creating a bottleneck to generic competition."[21]

Here, FDA's failure to grant Alvogen final approval and find that Teva forfeited its 180-day exclusivity subverts Congress's intent behind enacting the MMA provisions. The forfeiture provisions should be strictly construed to, among other things, safeguard the consumer from a First Applicant parking its 180-day exclusivity. *Hi-Tech*, 587 F. Supp. 2d at 4 (citing 149 Cong. Rec. S15746 (daily ed. Nov. 24, 2003)) ("Congress enacted the forfeiture provisions to 'ensure that the 180–day exclusivity period enjoyed by the first generic to challenge a patent cannot be used as a bottleneck to prevent additional generic competition.'") (statement of Sen. Schumer)). The FDA Teva Decision is contrary to the direct purpose of the MMA forfeiture provisions in preventing bottlenecks that frustrate ready and able generic drug manufactures from bringing their less expensive alternatives to the market.

In view of the above, the Court can end its inquiry and grant the relief Alvogen seeks. That notwithstanding, FDA has taken the position that any identified change in approval requirements does not have to be the "but for" cause of delay in approval. (AR at FDA-000002; *see also* 180-Day Exclusivity Q&A Guidance at 22. If FDA is applying this interpretation here, it runs contrary to the plain language of the statute that requires the change to be the actual cause of delay in approval, not the applicant's own actions and defects in its ANDA. *See* 21 U.S.C. § 355(j)(5)(D)(i)(IV) (stating forfeiture occurs if "[t]he first applicant fails to obtain tentative approval of the application within 30 months after the date on which the application is filed, unless the failure is *caused by* a change in or a review of the requirements for approval of the application") (emphasis added)); *see also, e.g.*, *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359

---

[21] *See* note 6, *supra.*

(2018) (finding that the agency did not follow plain meaning of the statutory text and stating,
"[w]here a statute's language carries a plain meaning, the duty of an administrative agency is to
follow its commands as written, not to supplant those commands with others it may prefer.");
*Eagle*, 952 F.3d at 337 (finding that FDA did not apply a plain reading of the statute and granting
summary judgment in favor of plaintiff).  For this additional reason, the Court should reject the
reasoning of the FDA Teva Decision and find in Alvogen's favor.

In sum, under a plain reading of the FDCA statute and the facts outlined above, any
180-day exclusivity period has been forfeited by Teva, and Alvogen's ANDA should be granted
final approval.  The Court should grant Alvogen's combined preliminary injunction and
summary judgment motion and order FDA to immediately grant final approval to Alvogen's
ANDA.

**B.      Teva Lost Any 180-Day Marketing
         Exclusivity Tied to Its Paragraph IV Certifications.**

**1.      Teva No Longer Legally Maintained Its Paragraph IV
         Certifications When It Entered Into the Stipulation Order.**

Teva further lost its status as a First Applicant and forfeited any right to 180-day
exclusivity as a result of a court order finding the '866 patent valid and infringed.[22]  Specifically,
the court overseeing the patent litigation between Teva and BDSI signed and entered an order in
which Teva "acknowledged and agreed that the ['019 and '866 patents] are valid, enforceable,
and infringed with respect to [Teva's ANDAs]."  (*See, e.g.*, AR at FDA-000271).  The court

---

[22] Although the Orange Book currently lists the '843 and '539 patents for BELBUCA, neither of
those patents were listed (or even issued) when Teva submitted its first Paragraph IV
certifications in September 2016.  *See* Exhibits B and C (showing May 23, 2017 and February
27, 2018 issuance dates for the '843 and '539 patents, respectively).  As neither of these patents
was a patent that qualified Teva for exclusivity, even if Teva had amended its Paragraph IV
certification to cover them, the amended certification would not prevent forfeiture of exclusivity.
*See* 180-Day Exclusivity Q&A Guidance, at 18.

further ordered that "[a]ll claims and defenses . . . are hereby dismissed, with prejudice" and that

the parties "expressly waive[d] any right to appeal or otherwise move for relief from" the parties'

stipulation and court's order.  *Id.*

As FDA's regulations make clear:

> An applicant who has submitted a paragraph IV certification and is
> sued for patent infringement must submit an amendment to change
> its certification if a court enters a final decision from which no
> appeal has been or can be taken, or *signs and enters a settlement*
> *order or consent decree in the action that includes a finding that*
> *the patent is infringed*. . . .  In its amendment, the applicant must
> certify under paragraph (a)(12)(i)(A)(3) of this section that the
> patent will expire on a specific date or, with respect to a patent
> claiming a method of use, the applicant may instead provide a
> statement under paragraph (a)(12)(iii) of this section if the
> applicant amends its ANDA such that the applicant is no longer
> seeking approval for a method of use claimed by the patent. *Once*
> *an amendment for the change has been submitted, the ANDA will*
> *no longer be considered to contain a paragraph IV certification to*
> *the patent*.

21 C.F.R. § 314.94(a)(12)(viii)(A) (emphasis added); *see also Kisor v. Wilkie*, 139 S. Ct. 2400,

2415 (2019) ("[A] court should not afford . . . deference unless the regulation is genuinely

ambiguous. . . .  If uncertainty does not exist . . . [t]he regulation then just means what it

means—and the court must give it effect as the court would any law.")

When the court signed and entered the stipulated order with a finding that the patents

were valid, enforceable, and infringed, Teva (1) no longer lawfully maintained its Paragraph IV

certification to those patents and (2) should have converted its Paragraph IV certifications to

Paragraph III certifications,[23] forfeiting any right to the 180-day exclusivity period.  *See*

21 U.S.C. § 355(j)(5)(D)(i)(III) (first applicant forfeits when it "amends or withdraws the

---

[23] A Paragraph III certification is one by which an ANDA applicant agrees to not market its
product until the relevant patent expires.  *See* 21 U.S.C. § 355(j)(2)(A)(vii)(III).

certification for all of the patents with respect to which that applicant submitted a certification qualifying the applicant for the 180-day exclusivity period").  "Where [a first applicant] lists a patent in a paragraph IV certification and loses in litigation through a judgment that confirms infringement and rejects invalidity, that applicant may no longer lawfully maintain its paragraph IV certification."  *Apotex, Inc. v. Daiichi Sankyo, Inc.*, 781 F.3d 1356, 1363 (Fed. Cir. 2015).

FDA's regulations dictate that the court's action in signing and entering such an order requires that Teva amend its Paragraph IV certification to a Paragraph III certification.  *See* 21 C.F.R. § 314.94(a)(12)(viii)(A).  FDA is bound by those regulations because "[i]t is . . . clear beyond cavil that an agency acts arbitrarily and capriciously if it acts in a manner that is contrary to its own regulations or a congressional statute."  *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018).  Indeed, "while an administrative agency can certainly 'amend or repeal its own regulations,' it is not free to 'ignore or violate its regulations while they remain in effect.'"  *Id.* (citation omitted); *see also In re MDL 2700 Genentech Herceptin (Trastuzumab) Mktg. & Sales Prac. Litig.*, 960 F.3d 1210, 1234 (10th Cir. 2020) ("Because the regulatory language resolves the question before us, we need not, and indeed cannot, . . . defer to the FDA's interpretation . . . .").  FDA is thus bound by its regulations to require Teva to amend its Paragraph IV certification to a Paragraph III certification.

The court in the *BDSI/Teva* cases specifically entered an order that the '866 patent is valid, enforceable, and infringed, and that order can only be interpreted as "a settlement order or consent decree in the action that includes a finding that the patent is infringed . . . ."  21 C.F.R. § 314.94(a)(12)(viii)(A).  Moreover, the court dismissed all claims and defenses, including Teva's non-infringement and invalidity defenses, "with prejudice" and determined that the order was not appealable.  In doing so, the court "**ORDERED, ADJUDGED AND DECREED**" the

parties' agreement resolving the action and, as such, there can be no question that what was entered is a settlement order or consent decree.  (AR at FDA-000271 (emphases in original).) Given the clear mandate of FDA's regulations, Teva has failed to "lawfully maintain" its Paragraph IV certifications and thus no longer qualifies as the First Applicant.  *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb).  This Court should thus find that Teva has forfeited any right to the 180-day exclusivity period.  *See* 21 U.S.C. § 355(j)(5)(D)(i)(III).

       **2.**      **Teva Knew How to Avoid 180-Day**
                   **Marketing Exclusivity Forfeiture But Failed to Do So.**

Teva knows how to enter into a settlement agreement and maintain its Paragraph IV certification by not having a court enter a finding of infringement in a settlement order or consent decree, and thus, comply with both Sections 314.94(a)(12)(v) and 314.94(a)(12)(viii)(A).  For example, Teva recently settled a matter between it and another NDA holder.  In entering into a consent judgment there, Teva agreed that "nothing in [the] Consent Judgment prohibits Teva . . . from maintaining 'Paragraph IV Certification'" in light of Teva taking a license to the patent. *See* Consent Judgment, *Merck Sharp & Dohme Corp. v. Teva Pharm. USA, Inc.*, No. 19-318 (D. Del. Nov. 10, 2020), ECF No. 186 (Exhibit D).  Notably, Teva *did not* acknowledge validity, enforceability, and infringement of the patent in that consent judgment.  *Id.*  And Teva has entered into similar judgments in multiple cases where it has maintained its Paragraph IV certifications, while not acknowledging the validity, enforceability, and infringement of the relevant patents.  *See, e.g.*, Stipulated Consent Judgment and Injunction, *Bausch Health Ir. Ltd. v. Teva Pharm. USA, Inc.*, No. 19-12404 (D.N.J. Mar. 23, 2020), ECF. No. 35 (same) (Exhibit E); Consent Judgment and Order of Permanent Injunction, *Sucampo AG v. Teva Pharm. USA, Inc.*, No. 17-7451 (D.N.J. Sept. 19, 2018), ECF No. 31 (same) (Exhibit F); Consent Judgment, *Boehringer Ingelheim Pharm. Inc. v. HEC Pharm Co., Ltd.*, No. 15-5982 (D.N.J. May 8, 2018),

ECF No. 523 (same) (Exhibit G).  Yet, here, Teva agreed to language in the court's settlement order for its action against BDSI with an express finding that the patents were valid, enforceable, and infringed with no mention of maintaining its Paragraph IV certification in light of taking a license.  (*See, e.g.*, AR at FDA-000271).

In view of Teva's failure to "lawfully maintain[] a certification described in paragraph (2)(A)(vii)(IV)," i.e., its Paragraph IV certification (*see* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb)), and the requirement to amend its Paragraph IV certification to a Paragraph III certification as a result of the court in the *BDSI/Teva* litigation entering an order that Teva infringes the '866 patent, Teva is no longer entitled to the 180-day exclusivity period, regardless of the fact that it has taken a license to the '866 patent.  *See* 21 C.F.R. § 314.94(a)(12)(viii)(A) (stating that an ANDA applicant that has submitted a Paragraph IV certification must change it to a Paragraph III certification "if a court enters a final decision from which no appeal has been or can be taken, or signs and enters a settlement order or consent decree in the action that includes a finding that the [relevant] patent is infringed"); 21 U.S.C. § 355(j)(5)(D)(i)(III) (stating that a First Applicant forfeits any entitlement to exclusivity if it amends or withdraws its Paragraph IV certifications to the relevant patents); *Apotex*, 781 F.3d at 1363 n.3 ("The required application amendment causes the first filer to forfeit its eligibility for any market exclusivity based on that certification.").

### 3.   The Relevant FDA Regulations Support the Forfeiture of Teva's 180-Day Marketing Exclusivity.

Contrary to the clear mandate of 21 C.F.R. § 314.94(a)(12)(viii)(A), however, FDA has taken the position that Teva can maintain its Paragraph IV certification because it has taken a license to enter the market prior to expiration of the '866 patent.  (AR at FDA-000012.)  That regulation states:

> If the ANDA is for a drug or method of using a drug claimed by a
> patent and the applicant has a licensing agreement with the patent

> owner, the applicant must submit a paragraph IV certification as to
> that patent and a statement that the applicant has been granted a
> patent license. If the patent owner consents to approval of the
> ANDA (if otherwise eligible for approval) as of a specific date, the
> ANDA must contain a written statement from the patent owner that
> it has a licensing agreement with the applicant and that it consents
> to approval of the ANDA as of a specific date.

21 C.F.R. § 314.94(a)(12)(v).  FDA determined that this regulation controls because, it contends, that Section 314.94(a)(12)(viii)(A) "does not address the effect of a license to the patent on the ANDA applicant's patent certification."  (AR at FDA-000012.)

FDA thus appears to be taking the position that Section 314.94(a)(12)(v) trumps the clear mandate of Section 314.94(a)(12)(viii)(A).  But, in the absence of congressional intent to the contrary, regulations should be harmonized to render each effective.  *See Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1285 (1983) ("[P]rinciple[s] of statutory construction favor[] interpretations that give effect to every provision of a statute so that no part is rendered 'inoperative or superfluous, void or insignificant.'" (quoting 2A C. SANDS, STATUTES AND STATUTORY CONSTRUCTION § 46.06 (4th ed. 1973))); *see also* A. SCALIA & B. GARNER, *Reading Law: The Interpretation of Legal Texts* 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory . . . .  [T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously.").  FDA's reliance on Section 314.94(a)(12)(v) is misplaced because Teva entered into the settlement order or consent decree with a finding of infringement, thereby requiring it to amend its patent certification from Paragraph IV to III under Section 314.94(a)(12)(viii)(A).

The Court can and should harmonize Sections 314.94(a)(12)(v) and 314.94(a)(12)(viii)(A), such that both remain effective.  *Id.*  Indeed, both regulations can be implemented to avoid conflict.  First, Section 314.94(a)(12)(v) allows an ANDA applicant to make or maintain a Paragraph IV certification when it takes a license.  Second, and in contrast,

Section 314.94(a)(12)(viii)(A) specifically covers instances where a court "signs and enters a settlement order or consent decree in [a litigation] that includes a finding that the patent is infringed."  Reading these sections together, an ANDA applicant can make or maintain a Paragraph IV certification when it takes a license when the license to the Orange Book listed patent is taken either (1) outside the context of litigation or (2) while entering a settlement order or consent decree that does not contain a finding of infringement.  This can occur without conflict with Section 314.94(a)(12)(viii)(A).  To give any other interpretation "would be to impute to Congress a purpose to paralyze with one hand what it sought to promote with the other."  *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 631 (1973) (quoting *Clark v. Uebersee Finanz-Korp.*, 332 U.S. 480, 489 (1947)) (internal quotations omitted).  The Court, thus, should find that Teva has not lawfully maintained its Paragraph IV certification to the '866 patent, even though Teva has taken a license to the '866 patent.

Contrary to its position now, FDA set forth the very regulatory interpretation being advanced by Alvogen during the notice and comment rulemaking process.  In fact, when publishing 21 C.F.R. § 314.94(a)(12)(viii)(A) as a proposed rule, FDA stated that it "[n]ote[s] . . . that if a settlement is reached *without a finding of patent infringement* or invalidity, then a paragraph IV certification may continue to be appropriate," (*see* 80 Fed. Reg. 6802, 6844 (Feb. 6, 2015) (emphasis added)), which would be allowed by Section 314.94(a)(12)(v) when an applicant takes a license without a court entering a finding of infringement.  When FDA finalized the rule, it reiterated that statement and stated that it received no comments on the proposed rule and was finalizing it without change, except for a technical amendment that is not relevant here. 81 Fed. Reg. 69,580, 69,614 (Oct. 6, 2016).  Teva, however, did not reach a settlement with BDSI *without a finding of patent infringement*.  As such, and per FDA's previously-stated

position regarding Section 314.94(a)(12)(viii)(A), Teva should have amended its Paragraph IV certification for the '866 patent to a Paragraph III certification, thus forfeiting its exclusivity period.[24]

Instead of applying the interpretation FDA set forth during the notice and comment rulemaking process, FDA here ignored the plain language of Section 314.94(a)(12)(viii)(A) and concluded that, "to give meaning to a license permitting marketing before the patent expires, the ANDA applicant must be able to maintain a paragraph IV certification."  (AR at FDA-000012.) But, this conclusion not only fails to read the regulations in harmony, it also disregards the fact that parties regularly enter license agreements without having a court enter a settlement order or consent decree with an express finding of infringement.  In fact, as discussed more fully above, Teva regularly settles its patent cases without the court entering such an order.

For this separate reason, FDA's refusal to grant final approval to Alvogen should be reversed as contrary to statute and FDA's regulations, and FDA should be ordered to grant final approval to Alvogen's ANDA without further delay.

## IV.    FDA'S UNLAWFUL DECISION IS RIPE FOR REVIEW BY THIS COURT BECAUSE ALVOGEN IS BEING SIGNIFICANTLY HARMED.

As stated above, an agency determination is ripe if it is (1) fit for judicial review and (2) substantial hardship will result if such review is postponed.  *Nat'l Ass'n of Home Builders*, 440 F.3d at 463-64.  Here, both factors are met.  First, the facts discussed above and outlined in the Administrative Record that form the basis for FDA determining that Teva can maintain its

---

[24] Erika Lietzan, a scholar on the Hatch-Waxman Act, posed a similar question and answered it based on her extensive research on these provisions:  "*Does a settlement agreement result in 'amendment' of the certification and thus give rise to forfeiture under subparagraph (D)(i)(III)?* Short Answer: *Only if it includes a finding of infringement*. This will require the first applicant to amend its paragraph IV certification to a paragraph III certification, giving rise to forfeiture under section 505(j)(5)(D)(i)(III)."  Erika Lietzan & Julia Post, *The Law of 180-Day Exclusivity*, 71 FOOD & DRUG L.J. 327, 361 (2016) (first emphasis in original).

180-day marketing exclusivity are already established.  FDA has made its final decision denying

final approval to Alvogen's ANDA based on those facts.  As such, "judicial intervention would

[not] inappropriately interfere with further administrative action" here and this Court will not

"benefit from further factual development of the issues presented." *Reckitt*, 613 F.3d at 1137

(quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).  Second, Alvogen

is already suffering and will continue to suffer substantial and irreparable harm if FDA does not

grant its ANDA final approval.  Absent this Court's action ordering FDA to approve Alvogen's

ANDA, Alvogen cannot immediately launch its generic Buprenorphine Film products and must

wait until it obtains a final decision from which no appeal can be taken finding that the '866

patent is invalid or not infringed – which may not occur for about two years.  *See* 21 U.S.C.

§ 355(j)(5)(D)(i)(I)(bb)(AA).  Every day that FDA's improper delay of Alvogen's final approval

remains is costing Alvogen its first-mover advantage into this market and is depriving the public

from vigorous generic competition with the brand product that will lower prices for patients and

payors.  *See* Zaku Decl. ¶ 13.

> **A.     Alvogen Will Be Substantially and Irreparably
>            Harmed by the Loss of Its First-Mover Advantage.**

Alvogen is the only ANDA filer that has obtained tentative approval and thus is the only

company that can immediately market a generic Buprenorphine Film product if FDA's wrongful

decision preserving Teva's exclusivity is reversed.  As a first mover, Alvogen can establish

unique and lasting customer relationships, enhance its reputation, and gain significant and

enduring market share and revenues.  *Id.*  These losses are not easily measurable or compensable

through money damages.  *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 29 (D.D.C.

1997).  Without Court action, Alvogen will be denied this advantage and will be substantially

and irreparably harmed.  In fact, courts consistently recognize the unique value of the first-mover

advantage, acknowledge the harm a party suffers when improperly denied that advantage, and grant preliminary injunctions to remedy the harm.  *See, e.g.*, *id.* at 29 (citing *Mova*, 955 F. Supp. 128 at 130-31); *TorPharm, Inc. v. Shalala*, No. 97-1925, 1997 WL 33472411, at *4 (D.D.C. Sep. 15, 1997) (issuing a preliminary injunction where the plaintiff would "be permanently disadvantaged in the market" because "timely entry into the market is critical for success").

Here, the loss of the first-mover advantage for Buprenorphine Film will seriously injure Alvogen.  *See* Zaku Decl. ¶¶ 13-14.  As the only generic product on the market, Alvogen would obtain critical access to important Buprenorphine Film customers that otherwise would not be available.  *Id.*; *see also Teva Pharm., USA, Inc. v. FDA*, 182 F.3d at 1011 n.8 (later-entering generic manufacturers "face continued harm because of their denied access to the market . . . , harm potentially heightened because of [a first applicant's] period of market exclusivity.").  These opportunities are extremely valuable to Alvogen, and their loss would cause substantial and irreparable harm.  *See* Zaku Decl. ¶ 11, 13; *see also Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008) (holding that, although "loss of market opportunities cannot be quantified or adequately compensated," they nevertheless constitute "evidence of irreparable harm") (citations omitted).

Further, wrongfully denying Alvogen its first-mover advantage will deprive Alvogen of its best opportunity to earn and maintain market share for Buprenorphine Film, a harm that is difficult to calculate precisely.  *See* Zaku Decl. ¶ 14; *see also Albany Molecular Rsch., Inc. v. Dr. Reddy's Labs., Ltd.*, No. 09-4638, 2010 WL 2516465, at *10-11 (D.N.J. June 14, 2010) (concluding that harms such as lost market share and price erosion are difficult to quantify and irreparable).  As a first generic entrant marketing an ANDA product, Alvogen will be able to gain a significant share of the generic Buprenorphine Film market during the exclusivity period.

*See* Zaku Decl. ¶¶ 13-14.  Even after other generic competitors enter the market, Alvogen

expects that it would be able to maintain a significantly larger market share than its competitors

due to its head start.  *Id.* ¶ 15.  This enduring market share results from a combination of access

to better customers and the long-term nature of many purchasing arrangements.  *Id.*; *see also*

*TorPharm*, 1997 WL 33472411, at *4.  There will be no way to replicate this market dynamic if

other generics obtain final approval at the same time as Alvogen and are able to launch their

ANDA products on the market with Alvogen if Alvogen's market entry is further delayed.  *See*

Zaku Decl. ¶ 15.

At least one other generic drug manufacturer, Chemo Research, S.L., has submitted an

ANDA for Buprenorphine Film in five out of the seven strengths for which Alvogen also seeks

approval.[25]  Complaint for Patent Infringement, *BioDelivery Sci. Int'l, Inc. v. Chemo Rsch., S.L.*,

No. 19-444 (D. Del. Mar. 1, 2019), ECF No. 1.  Chemo Research's ANDA has been on file since

at least sometime in January 2019, and the August 1, 2021 expiration of the 30-month stay on its

approval is fast approaching.  Supplemental Information for Patent Cases Involving an

Abbreviated New Drug Application (ANDA), *BioDelivery Sci. Int'l, Inc. v. Chemo Rsch., S.L.*,

No. 19-444 (D. Del. Mar. 1, 2019), ECF No. 3.  Chemo's ANDA could, consequently, obtain

tentative approval any day now.  Every day this Court delays and FDA's wrongful decision is

left in place is, therefore, another day of irreparable harm to Alvogen because its window to be

the only generic Buprenorphine Film on the market continues to close.

Being one of the first companies to offer a generic Buprenorphine Film ANDA product

will also allow Alvogen to generate substantial goodwill with existing and prospective

---

[25] Chemo Research's ANDA does not seek approval for the 600 mcg and 750 mcg strengths.
Complaint for Patent Infringement, *BioDelivery Sci. Int'l, Inc. v. Chemo Rsch., S.L.*, No. 19-444
(D. Del. Mar. 1, 2019), ECF No. 1 ¶ 34.

customers.  *See* Zaku Decl. ¶ 16.  The generic drug business is highly competitive, and a small number of wholesalers account for the majority of generic drug purchases from manufacturers in the United States.  *Id.*  These large purchasers prize the ability to offer newly-available generic drugs to their own customers.  *Id.*  As a result, they often aggressively pursue relationships with generic first-movers.  *Id.*  Alvogen's ability to enter the market as the only generic alternative provides it with a unique opportunity to establish and strengthen its relationships with these key customers through their interest in stocking generic Buprenorphine Film as soon as it is available.  *Id.*

The many intangible benefits of being a first-mover will be irretrievably lost if this Court does not act to reverse FDA's wrongful denial of final approval of Alvogen's ANDA products. *Id.* ¶¶ 14-17.  Substantial and irreparable harm will result if Alvogen's final approval continues to be delayed or occurs at the same time as other competing generic Buprenorphine Film ANDA products.  *Id.* ¶ 18.  Unless this Court finds for Alvogen on the merits, Alvogen's ability to gain important access to customers and enter long-lasting relationships with those customers will be lost.  Thus, Alvogen is being and will continue to be substantially and irreparably harmed.

### B.    Alvogen Will Suffer Substantial and Unrecoverable Economic Loss.

Alvogen will also suffer substantial, unrecoverable economic loss if FDA continues to withhold final approval.  FDA itself recognizes "the highly competitive nature of the generic drug approval process and the possibility of substantial profits for the recipient" of marketing exclusivities.  *See Guidance for Industry, 180-Day Exclusivity When Multiple ANDAs Are Submitted on the Same Day* (July 2003).[26]  If Alvogen were allowed to promptly enter the market, as it expected to do on January 30, 2021, it would have obtained a significant share of

---

[26] *Available at* https://www.fda.gov/media/71304/download (last visited April 1, 2021).

the market for Buprenorphine Film, sales of which by BDSI exceeded $136,120,000 in 2020.

*See* Exhibit A at F-26.  In fact, Alvogen estimates that it will be able to generate sales of over

$10 million per month for its Buprenorphine Film product.  *See* Zaku Decl. ¶ 13.  And Alvogen

will only be able capture this substantial market opportunity now before other generic

Buprenorphine Film products are approved.  *Id.* ¶¶ 13-16.  Thus, the practical effect of FDA's

erroneous decision to not approve Alvogen's ANDA approval, if left unchecked, will be to

diminish much of the economic value of Alvogen's product.  *Id.* ¶¶ 19, 20.

Alvogen also made a substantial investment in its generic Buprenorphine Film product,

including diligently seeking and obtaining tentative approval within 13 months of its ANDA's

submission, taking on the risks and costs of patent litigation, establishing a production process,

and building up significant inventories of Buprenorphine Film, with the expectation that FDA

would properly award it final approval at the expiration of the 30-month stay on January 30,

2021.  *Id.* ¶ 17.  Such investment by Alvogen will be significantly diminished if FDA continues

to deny Alvogen final approval.

This Court has held that economic loss may be irreparable when it cannot be recovered

and when the effect of that loss on the plaintiff is serious.  *Mova*, 955 F. Supp. at 131; *see also*

*Bracco Diagnostics*, 963 F. Supp. at 29.  Without a preliminary injunction and final decision

from this Court, Alvogen has no legal recourse either against FDA or against a competitor

entering the market at the same time as Alvogen.  *See Mylan Pharm., Inc. v. Thompson*, 268 F.3d

1323, 1332 (Fed. Cir. 2001) (holding that FDCA does not create a private right of action).

Without the requested relief, therefore, the direct economic value of the exclusivity period will

be irretrievably lost.

**CONCLUSION**

For the foregoing reasons, Alvogen respectfully requests that this Court grant Alvogen's

motion for a preliminary injunction and summary judgment and direct Secretary Becerra, Acting

Commissioner Woodcock, and FDA to immediately grant Final Approval to Alvogen's ANDA,

as set forth in the Proposed Order submitted herewith.


Dated:  April 2, 2021                                       Respectfully submitted,
                                                            */s/ Chad A. Landmon*
                                                            Chad A. Landmon (DC Bar No. 990347)
                                                            AXINN, VELTROP & HARKRIDER LLP
                                                            90 State House Square
                                                            Hartford, CT 06103
                                                            T: (860) 275-8100
                                                            F: (860) 275-8101
                                                            clandmon@axinn.com

                                                            Aziz Burgy (DC Bar No. 483517)
                                                            Christopher M. Gallo (DC Bar No. 1030598)
                                                            AXINN, VELTROP & HARKRIDER LLP
                                                            950 F Street NW, 7th Floor
                                                            Washington, DC 20004
                                                            T: (202) 912-4700
                                                            F: (202) 912-4701
                                                            aburgy@axinn.com
                                                            cgallo@axinn.com

                                                            *Attorneys for Plaintiffs Alvogen, Inc., Alvogen*
                                                            *PB Research and Development LLC, and*
                                                            *Alvogen Malta Operations Ltd.*